Filed 6/24/16

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


| | |
|---|---|
| THE PEOPLE, | H041050 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. 185632) |
| v. | |
| JOHNNY MELENDEZ CORDOVA, | |
| Defendant and Appellant. | |


Defendant Johnny Melendez Cordova is serving a sentence of 25 years to life under the "Three Strikes" law. He petitioned the trial court for resentencing under Penal Code section 1170.126 (§ 1170.126), which is part of the Three Strikes Reform Act of 2012, also known as Proposition 36 (Reform Act). That act entitled him to a reduction in his sentence unless such a reduction would "pose an unreasonable risk of danger to public safety." (Pen. Code, § 1170.126, subd. (f) (§ 1170.126(f)).) The trial court found this condition to be present and denied his petition on that ground. While this appeal from that ruling was pending, voters adopted the Safe Neighborhoods and Schools Act, also known as Proposition 47 (Safe Neighborhoods Act), which substantially narrowed the definition of "unreasonable risk of danger to public safety" as that phrase was "used throughout this Code." (Pen. Code, § 1170.18, subd. (c) (§ 1170.18(c)).) We conclude that the new definition applies, in accordance with its plain terms, to determinations of dangerousness under the Reform Act, and that notwithstanding the presumption against statutory retroactivity, it applies to petitions that had already been adjudicated when it

was adopted. Accordingly, we will reverse with directions to conduct a new hearing on defendant's petition in which section 1170.18(c)'s definition of dangerousness will govern the determination whether resentencing will pose an unreasonable risk of danger to public safety. This disposition renders moot defendant's challenge to the sufficiency of the evidence to sustain the trial court's ruling under the prior standard. We reject defendant's contentions that (1) conditioning relief on non-dangerousness violates his right to equal protection of the laws; (2) failing to prove dangerousness to a jury beyond a reasonable doubt violates his constitutional right to jury trial; and (3) a "strong presumption" favors resentencing. We emphasize, however, that the state bears the burden of proving that resentencing would create an unreasonable risk of danger as defined in section 1170.18(c).

## BACKGROUND

### A. Defendant's Strikes.

In May 1973, at the age of 19, defendant was charged with a number of felonies arising from two incidents on successive days. One incident involved a home invasion robbery in which, according to the police report, defendant held a woman and her children at gunpoint while threatening violence against them. According to a later decision by this court, defendant eventually accumulated four convictions for serious or violent felonies—commonly known as strikes—for purposes of the Three Strikes law, Penal Code sections 667 and 1192.7. (*People v. Cordova* (Nov. 25, 1998, H015896) [nonpub. opn.] [at pp. 16-17].)[1]

---

[1] We have granted respondent's request for judicial notice of the cited opinion as well as an earlier opinion concerning one of the 1973 offenses and a 1982 offense for possession of a firearm by a convicted felon. (*People v. Cordova* (Dec. 27, 1985, A028169) [nonpub. opn.].) According to the District's Attorneys opposition memorandum below, the latter charge arose when a plainclothes officer saw defendant

2

## B. Three Strikes Law.

Two decades after defendant sustained the foregoing convictions, voters and the Legislature, respectively, adopted the Three Strikes law.[2] (Former Pen. Code, § 667 [Stats. 1994, ch. 12, § 1]; former Pen. Code, § 1170.12 [Prop. 184, as approved by voters, Gen. Elec. (Nov. 8, 1994)].) From its enactment until 2012, it provided that a defendant with a prior strike who was convicted of any subsequent felony would receive what came to be known as a "second strike" sentence, i.e., imprisonment for "twice the term otherwise provided as punishment." (Pen. Code, § 667, subd. (e)(1), as adopted by Stats. 1994, ch. 12, § 1; *id*., § 1170.12, subd. (c)(1), as adopted by Prop 184.) One with two strikes who suffered a subsequent felony conviction would receive a "third strike" sentence of 25 years to life. (Former Pen. Code, §§ 667, subds. (e)(1), (e)(2)(A)(ii), as adopted by Stats. 1994, ch. 12, § 1]; former Pen. Code, § 1170.12, subds. (c)(1), (c)(2)(A)(ii), as adopted by Prop 184.)

## C. Defendant's Third-Strike Conviction.

In December 1995 defendant was arrested on a charge of carrying a concealed dirk or dagger, a violation of former Penal Code section 12020, subdivision (a). (See now Pen. Code, § 21310.) In July 1996 a jury found him guilty of that offense. The offense was (and still is) a "wobbler," i.e., it could be prosecuted either as a misdemeanor or a felony; if punished as a felony, it would ordinarily carry a maximum penalty of three years' imprisonment. (Former Pen. Code, § 12020, subd. (a), as adopted by Stats.1994, ch. 23, § 4, p. 132; former Pen. Code, § 18, as adopted by Stats. 1976, ch. 1139, § 98,

---

firing a hunting rifle at a shooting range. Defendant told the officer that "he had recently purchased the weapon for $1,100 and . . . was planning on hunting . . . in Idaho."

[2] We refer to the law in the singular while recognizing that it was adopted in two versions—which do not, however, vary materially for present purposes.

3

p. 5089; see now Pen. Code, §§ 21310, 1170, subd. (h).) As a third-striker, however, defendant was sentenced to prison for 25 years to life.[3] This court affirmed the conviction and sentence. (*People v. Cordova*, *supra*, H015896 [p. 17].)

### D. Reform Act.

Defendant was serving the above sentence on November 6, 2012, when voters adopted the Reform Act. It has two chief components: "the first part is *prospective* only, reducing the sentence to be imposed in future three strike cases where the third strike is not a serious or violent felony (Pen. Code, §§ 667, 1170.12); the second part is *retrospective*, providing *similar, but not identical*, relief for prisoners already serving third strike sentences in cases where the third strike was not a serious or violent felony (Pen. Code, § 1170.126)." (*People v. Superior Court (Kaulick)* (2013) 215 Cal.App.4th 1279, 1292 (*Kaulick*).) More specifically, the prospective provisions make new non-strike felonies generally punishable by a maximum sentence of double the base term—a former second-strike sentence—regardless of the number of strike priors. (Pen. Code, §§ 1170.12, subd. (c)(2)(C), 667, subd. (e)(2)(C).) The retrospective provision, section 1170.126(f), entitles third-strikers who would be eligible for reduced sentencing if their convictions were new to petition for recall of sentence.

Section 1170.26(f) directs that a petitioner who satisfies the criteria for eligibility "shall be resentenced" as a second-striker "unless the court, in its discretion, determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety." In exercising the discretion thus granted, the court may consider: "(1) The

---

[3] The probation officer recommended a sentence of 31 years to life, consisting of the third-strike life sentence plus six one-year enhancements for prior convictions. (See Pen. Code, § 667.5, subd. (b).) According to our decision in that case, the trial court stayed the enhancements. The correct procedure was to strike them, but nothing has been made of the trial court's failure to do so. (See *People v. Langston* (2004) 33 Cal.4th 1237, 1241.) The trial court also denied a motion to strike any of the "strike" priors.

4

petitioner's criminal conviction history, including the type of crimes committed, the extent of injury to victims, the length of prior prison commitments, and the remoteness of the crimes; [¶] (2) The petitioner's disciplinary record and record of rehabilitation while incarcerated; and [¶] (3) Any other evidence the court, within its discretion, determines to be relevant in deciding whether a new sentence would result in an unreasonable risk of danger to public safety." (*Id.*, subd. (g).) However, the act contains no definition of "unreasonable risk of danger to public safety," a phrase which, at the time of its adoption, appeared nowhere else in the Penal Code.[4]

### E. Petition and Appeal.

On August 22, 2013, defendant filed a petition for resentencing under section 1170.126(f). The court found that he satisfied the criteria for eligibility—a point the state does not contest—and appointed counsel to represent him. A clinical psychologist conducted a mental health examination and found no evidence that defendant, then 60 years old, would pose an unreasonable risk of danger to public safety if released. However, the prosecutor presented over 950 pages of records reflecting an extensive history of criminal conduct beginning at the age of 13. These materials alluded to a number of uncharged crimes involving incipient or actual violence, including two homicides in which defendant was reportedly implicated.[5] In all, between

---

[4] The operative language may have been borrowed from cases reviewing decisions by the Board of Parole Hearings to deny parole to a life prisoner on the ground that, as stated in the governing regulation, "the prisoner will pose an unreasonable risk of danger to society if released from prison." (Cal. Code Regs., tit. 15, § 2402, subd. (a).) Cases have often couched such findings in terms of "an unreasonable risk of danger to public safety." (E.g., *Board of Prison Terms v. Superior Court* (2005) 130 Cal.App.4th 1212, 1221; *In re Moses* (2010) 182 Cal.App.4th 1279, 1286; *In re Tapia* (2012) 207 Cal.App.4th 1104, 1106.)

[5] A number of these offenses and suspected offenses apparently arose out of defendant's membership in Nuestra Familia, a notorious prison gang. In January 1997,

1973 and 1995, defendant was convicted of 17 misdemeanors and 12 felonies.  The prosecutor also cited an extensive disciplinary history in prison, although the only incidents that appeared to involve violence were (1) a reported threat by defendant in 2004 against an inmate he reportedly believed was a child molester—an incident attributed by both inmates to a misunderstanding; (2) a four-inmate fight in 2006, the origins of which officers were unable to establish, but in which one of the inmates was apparently armed with a razor blade[6]; and (3) a beating of defendant in 2006 by a cellmate for unknown reasons.  Evidence was also adduced of in-prison employment, with favorable reports by a supervisor, as well as participation in various rehabilitative and educational programs.  The evidence showed a history of drug use up to a few months before the hearing on the petition.[7]

---

and again in August 2002, prison authorities "validated" defendant as a "drop-out" of the gang.  At the hearing below, the prosecutor argued that his dropout status increased defendant's dangerousness by making him a "marked man" who was "going to have to engage in defending himself at any given time which . . . given his history, will . . . force him to regain and utilize weapons."  Of course if defendant had *not* dropped out of the gang, his membership would undoubtedly have been cited—far more plausibly—as evidence of continuing dangerousness.  Catch 22 is no part of our Penal Code.

[6] The trial court's remarks suggest that it found that defendant must have been the possessor of the blade because the record contains self-exculpatory statements by the other three participants.  One of the participants reportedly said, "I had to, the dude pulled a blade on me."  However we see nothing in the record identifying "the dude," and of course to draw any inference from any of the participants' statements requires the supposition, for which no evidence appears, that the speaker was speaking truthfully.  We find nothing in the records of this incident that could reasonably be characterized as reliable evidence that defendant was its author.  (See pt. V, *post*.)

[7] Defense counsel argued below that the 2006 assault had inflicted painful injuries which prison medical authorities treated with opiates, thus triggering the addiction, or relapse, which preceded the hearing.

The trial court denied the petition on May 19, 2014, finding "nothing right up until the most recent triggering offense to suggest to this Court that the petitioner presents anything but a substantial risk to public safety."  Defendant took this timely appeal.

### F.  *Proposition 47.*

While the appeal was pending, on November 4, 2014, the electorate enacted the Safe Neighborhoods Act.  It reclassified certain drug and theft related felonies as misdemeanors and, mirroring the Reform Act, provided for recall of sentences already being served for the reclassified offenses.  The resentencing provision, Penal Code section 1170.18 (§ 1170.18), echoes section 1170.126 in directing that the petitioner "shall be . . . resentenced . . . unless the court, in its discretion, determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety."  (*Id*., subd. (b) (§ 1170.18(b).)  But it goes on, as the Reform Act had not, to define this phrase:  "As used *throughout this Code*, 'unreasonable risk of danger to public safety' means an unreasonable risk that the petitioner will *commit a new violent felony* within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667."  (§ 1170.18(c), italics added.)  The cross-referenced section sets forth a limited list of "violent felony" offenses, sometimes known as "super strikes."  (See Couzens, et al., Prop47FAQs.pdf (November 2015), <http://www.courts.ca.gov/documents/Prop47FAQs.pdf> (as of Jun. 20, 2016).)  The effect of the new definition is to require resentencing unless the court finds an unreasonable risk that the petitioner will commit a super strike.  The question here is whether defendant may avail himself of this narrowed definition.  Basic principles of statutory construction compel the conclusion that he can.

## I.   *Applicability of Section 1170.18(c)*

### A.  *Introduction.*

The central question is whether section 1170.18(c)'s definition of "unreasonable risk of danger to public safety" applies to that phrase as used in section 1170.126(f).[8]  On the face of the two statutes the question seems to answer itself:  Section 1170.18(c) declares the definition applicable "throughout this Code."  "This Code" can only mean the Penal Code.  Section 1170.126 is part of the Penal Code.  Quod est demonstrandum: the definition applies to petitions under section 1170.126, i.e., Proposition 36.

It is of course the most fundamental of all principles of statutory construction that the role of the court in applying any statute is to carry out the intent manifested therein. (See Code Civ. Proc., § 1858 ["In the construction of a statute or instrument, the office of the Judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted"]; *County of Santa Clara v. Escobar* (2016) 244 Cal.App.4th 555, 562-563; *People v. Allegheny Casualty Co.* (2007) 41 Cal.4th 704, 709 ["If the language contains no ambiguity, we

---

**8**   A number of decisions have been issued by this and other courts addressing the applicability of section 1170.18(c) to Reform Act petitions.  Most cannot be cited, either because they were unpublished to begin with or because the Supreme Court has granted review.  (See Cal. Rules of Court, rules 8.1115(a), 8.1105(e)(1).)  One exception is *People v. Esparza* (2015) 242 Cal.App.4th 726, 734-737 (*Esparza*), in which the author of this opinion, together with the dissenting author and another member of the court, rejected arguments similar to defendant's.  The concurring justice has also concurred in the result in some (not citable) cases on the ground that while section 1170.18(c) applies by its terms to Reform Act petitions, it does not apply to petitions which were filed or decided before its effective date.  It must suffice to say that additional information and further reflection have led the majority to view as unsound the analysis in those and other cases reaching conclusions inconsistent with the ones we reach here.  "The words of the aphorism quoted by Justice Rutledge in his dissent in *Wolf v. Colorado* (1949) 338 U.S. 25, 47, 69 S.Ct. 1359, 1368, 93 L.Ed. 1782, are appropriate:  'Wisdom too often never comes, and so one ought not to reject it merely because it comes late.' "  (*Tapia v. Superior Court* (1991) 53 Cal.3d 282, 303 (dis. opn. of Mosk, J.).)

presume the Legislature meant what it said, and the plain meaning of the statute governs."].)

Respondent offers four arguments for a contrary conclusion, three of which are incorporated by lengthy quotation from a case that can no longer be cited. (See fn. 8, *ante*.) The four arguments are: (1) section 1170.18(c) applies by its terms only to persons seeking resentencing under the Safe Neighborhood Act's retroactive provisions; (2) the effect of section 1170.18(c) on Reform Act petitions was not mentioned in the ballot pamphlet and thus cannot have been intended by voters; (3) the "timing" of the Safe Neighborhood Act makes an intent to alter the Reform Act "illogical"; and (4) applying the new definition to Proposition 36 petitions contravenes the declaration in Proposition 47 that "[n]othing in this and related sections is intended to diminish or abrogate the finality of judgments in any case not falling within the purview of this act" (§ 1170.18, subd. (n)). These arguments do not, singly or in combination, override the plain language of section 1170.18(c).

## B. Use of "Petitioner."

We find somewhat bewildering the argument that section 1170.18(c) applies by its terms only to petitioners under the Neighborhoods Act. This conclusion is said to flow from "the plain language of Proposition 47," in that the definition refers to "the petitioner," which according to respondent can only mean a petitioner under section 1170.18. The statute thus "substantively limit[s]" the definition to Proposition 47 petitions.

This argument cannot withstand scrutiny. If anything, the use of "petitioner" is further evidence (see pt. I(C), I(F), *post*) that the drafters had Proposition 36 applicants—who are also "petitioner[s]"— in mind when they adopted a new and narrower definition for a phrase used in that earlier measure. Given the explicit directive to apply this

9

definition "throughout this Code," respondent's argument could at best give rise to an internal ambiguity or contradiction which would have to be resolved in favor of the latter phrase as the more definite and concrete expression of legislative intent. But this would assume that some clear textual basis could be found for respondent's reading. The directive that the definition apply "throughout this Code" actually appears in the statute, while the language imputed by respondent does not. There is thus no ambiguity or conflict to resolve. By unmistakable directive, the definition is to apply wherever the defined phrase appears. As it happens, the defined phrase appears in only one other place—the Reform Act—where it is relevant to determine a "petitioner's" right to relief. It is therefore applicable by its plain terms to this proceeding.

### C. *Voter Understanding.*

#### 1. **No Presumption of Voter Ignorance.**

The no-longer citable decision quoted by respondent states its chief rationale as follows: "[B]ecause Proposition 47's *ballot materials* and proposed statutory language *contained nothing* whatsoever to suggest that Proposition 47 would have any impact on the resentencing of anyone who was serving a sentence for a crime *other* than one of the specified nonserious, nonviolent property or drug crimes, it is inconceivable that voters intended for subdivision (c) of section 1170.18 to severely restrict the ability of a court to reject a resentencing petition under the Reform Act by a person convicted of crimes *other* than one of the specified property or drug crimes and whom the court considered dangerous. The Proposition 47 *ballot materials contained no mention of such a possible consequence . . . .*" (First and fourth italics added.)

This passage exemplifies two rhetorical devices generally employed to obscure rather than illuminate the truth. The first known as "honor by association," in which a false statement is coupled to a true one in hopes that the latter's luster will attach to the former in the mind of the listener. It appears here in the coupling of the phrase "and

10

proposed statutory language" with "ballot materials." It is true that the ballot materials contain no reference to the measure's effect on Proposition 36 petitions. But it is patently false that the statutory language contained "nothing whatsoever to suggest that Proposition 47 would have any impact" on persons serving sentences for crimes other than those for which Proposition 47 reduced the penalty. By its plain terms, the statute would apply "throughout this Code," which would include anywhere else the defined phrase was used. The attempt to grant substance to a contrary premise by coupling it to a true statement says more about the insecurity of the speaker's position than it does about the merits of the controversy.

A more serious defect is reflected in the quoted passage's use of an *argumentum ad ignorantiam*, or argument from ignorance, in which the absence of evidence for a premise is asserted as proof of the opposite premise. Such an argument is doubly offensive when, as here, there *is* evidence of the disputed premise, i.e., the plain *statutory language*, which is indeed the *best, most reliable, and safest* evidence of the point at issue. The argument's implicit major premise is that in the absence of affirmative *extrinsic* evidence to the contrary, voters can be presumed not to have understood the effects of the measures they adopt, however unmistakably those effects may flow from the language adopted. The court's reluctance to enunciate this premise—let alone defend it—is entirely understandable, since it contravenes fundamental principles of statutory construction as well as any concept of judicial restraint and, not surprisingly, nearly a century of precedent.

The correct rule is that voters "must be assumed to have voted intelligently upon an amendment to their organic law, the whole text of which was supplied each of them prior to the election, and which they must be assumed to have duly considered, regardless of any insufficient recitals in the instructions to voters or the arguments *pro* and *con* of its advocates or opponents accompanying the text of the proposed measure." (*Wright v.*

11

*Jordan* (1923) 192 Cal. 704, 713.) This principle has been reaffirmed through the years: "Petitioners' entire argument that, in approving Proposition 8, the voters must have been misled or confused is based upon the improbable assumption that the people did not know what they were doing. It is equally arguable that, faced with startling crime statistics and frustrated by the perceived inability of the criminal justice system to protect them, the people knew exactly what they were doing. In any event, we should not lightly presume that the voters did not know what they were about in approving Proposition 8. Rather, in accordance with our tradition, '*we ordinarily should assume that the voters who approved a constitutional amendment ". . . have voted intelligently upon an amendment to their organic law, the whole text of which was supplied each of them prior to the election and which they must be assumed to have duly considered.*" ' "[9] (*Brosnahan v. Brown* (1982) 32 Cal.3d 236, 252 (*Brosnahan*), quoting *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 243-244 (*Amador Valley*); see *In re Lance W.* (1985) 37 Cal.3d 873, 890, fn. 11 [upholding "truth in evidence" provision of Proposition 8; "The adopting body is presumed to be aware of existing laws and judicial construction thereof."].)

Here voters—faced with the startling fiscal and human costs of earlier reactions to crime—manifestly concluded that certain classes of prison inmates should never have been imprisoned in the first place—or in the case of the Reform Act, should not have been imprisoned for life—and should be therefore be resentenced to punishments better suited to "MAKE THE PUNISHMENT FIT THE CRIME," as the proponents of the

---

[9] In *Wright v. Jordon*, *supra*, 192 Cal. at p. 713, the court spoke only of amendments to the state's "organic law," which is a reference to the state Constitution. (See Black's Law Dict. (10th ed. 2014), p. 1274, col. 2.) However no basis readily appears to apply a different rule to purely statutory measures, and indeed the measure at issue in *Brosnahan* included both constitutional and statutory amendments. (See *Brosnahan*, *supra*, 32 Cal.3d at pp. 242-245.)

Reform Act loudly proclaimed in the ballot pamphlet. (Ballott Pamp., Gen. Elec. (Nov. 6, 2012) text of Prop. 36, p. 52.) We must assume that in enacting the Safe Neighborhoods Act, with its modification of the grounds on which such relief could be denied—a modification explicitly declared applicable throughout the code—voters "knew exactly what they were doing." (*Brosnahan*, *supra*, 32 Cal.3d at p. 252.)

A presumption of voter incomprehension is all the more repugnant when the measure at issue was "extensively publicized and debated." (*Amador Valley*, *supra*, 22 Cal.3d at p. 243.) In *Brosnahan*, the court rejected a contention that the measure at issue could be denied effect on the ground that its "complexity . . . may have led to confusion or deception among voters, who were assertedly uninformed regarding the contents of the measure." (*Brosnahan*, *supra*, 32 Cal.3d at p. 251.) In addition to the information in the ballot pamphlet, the court observed, voters had been exposed to "widespread publicity" concerning the measure: "Newspaper, radio and television editorials focused on its provisions, and extensive public debate involving candidates, letters to the editor, etc., described the pros and cons of the measure." (*Id.* at p. 252.) As demonstrated below, the same is true of Proposition 47, at least to the extent of newspaper editorials, opinion pieces, and web pages debating its merits.[10] Further, Proposition 47 was far less complex than the measure under scrutiny in *Brosnahan*, as to which the court rejected the suggestion that complexity alone could vitiate the voters' objectively manifested will: " 'Our society being complex, the rules governing it whether adopted by legislation or initiative will necessarily be complex. Unless we are to repudiate or cripple use of the initiative, risk of confusion must be borne.' " (*Ibid*., quoting *Fair Political Practices Com. v. Superior Court* (1979) 25 Cal.3d 33, 42.)

---

[10] In addition to the materials discussed in more detail below, which address the specific effect of Proposition 47 on Proposition 36 petitions, a sample of the many other articles reflecting the public debate preceding Proposition 47's enactment appears in the Appendix.

Lawmakers are not only presumed to be aware of the contents of their enactments; they are " ' "deemed to be aware of statutes and judicial decisions already in existence, and to have enacted or amended a statute in light thereof." ' " (*People v. Scott* (2014) 58 Cal.4th 1415, 1424.)  This principle has been applied to voter initiatives; indeed, it has been specifically applied to Proposition 47.  (*People v. Scarbrough* (2015) 240 Cal.App.4th 916, 925 [court would "deem the voters to have been aware of" judicial "interpretation" of good cause provision in Reform Act "when they approved Proposition 47"].)  Thus, "[a]bsent ambiguity, we presume that the voters intend the meaning apparent on the face of an initiative measure [citation] and the court may not add to the statute or rewrite it to conform to an assumed intent that is not apparent in its language. [Citation.]" (*Lesher Communications, Inc. v. City of Walnut Creek* (1990) 52 Cal.3d 531, 543.)  If the language of a voter-enacted measure is "clear and unambiguous, there ordinarily is no need for construction.  [Citations.]  We presume that the voters intended the meaning apparent on the face of the measure, and our inquiry ends.  [Citation.]" (*Woo v. Superior Court* (2000) 83 Cal.App.4th 967, 975; cf. *Robert L. v. Superior Court* (2003) 30 Cal.4th 894, 900-901, italics added [" '*When the language is ambiguous*, "we refer to other indicia of the voters' intent, particularly the analyses and arguments contained in the official ballot pamphlet." [Citation.]' [Citation.]"]; *Amador Valley, supra,* 22 Cal.3d 208, 245-246, italics added ["[T]he ballot summary and arguments and analysis presented to the electorate in connection with a particular measure may be helpful in determining the *probable meaning of uncertain language*."].)

Here no ambiguity appears.  That should end the inquiry.  This result is mandated not only by the most basic principles of statutory construction, but also by the constitutional separation of powers.  In enacting a ballot measure the voters are exercising a legislative power no less worthy of respect than that of their representatives in Sacramento.  (Cal. Const., art. IV, § 1; see *Brosnahan*, *supra*, 32 Cal.3d at p. 241,

14

quoting *Amador Valley*, *supra*, 22 Cal.3d at p. 248 ["it is our solemn duty jealously to guard the sovereign people's initiative power, 'it being one of the most precious rights of our democratic process' "].).) To nullify statutory language because voters' attention was not specifically drawn to it in the ballot pamphlet strikes at the heart of the initiative power and, more fundamentally, at the sovereign dignity of the legislative branch. Due regard for that dignity requires that when legislative will is expressed in clear language whose effects are not absurd and do not frustrate other positive manifestations of legislative intent, lawmakers—here, voters—must be *deemed* to have intended the effect of their enactments, whatever courts may believe about their subjective expectation, understanding, or level of insight.

This principle, which should be too obvious to need saying, is reflected in countless decisions. For example, in *In re Gabriel G.* (2005) 134 Cal.App.4th 1428, 1436, this court rejected a contention that the plain meaning of a statute could be disregarded because it led to unintended consequences: "[W]e must recall that in construing a statute, 'that which is construed is the statutory *text*.' [Citation.] *Evidence of legislative inadvertence would have to be quite compelling before we would ignore the plain language of the law.* [Citation.] The only evidence of inadvertence the Department offers is its assessment of the unintended consequences the change will have. *Legislation often has unintended consequences. But we cannot construe the amendment in a manner wholly unsupported by its text merely to avoid the purported unintended consequences.* [Citation.]" (*Id.* at pp. 1436-1437, italics added.)

The tacit premise of respondent's argument is that the literal effect of section 1170.18(c) on Reform Act petitions is an unintended consequence which courts can and should avert by refusing effect to the plain statutory language. But a consequence cannot be deemed unintended when the most reliable evidence of intent— the language lawmakers adopted as the objective manifestation of their will—clearly and

15

unambiguously directs it. "Courts may, of course, disregard even plain language which leads to absurd results or contravenes clear evidence of a contrary legislative intent." (*Ornelas v. Randolph* (1993) 4 Cal.4th 1095, 1105.) However, in the absence of such a predicate, " 'there is no need for construction, and *courts should not indulge in it*.' " (*Ibid*., fn. 8, quoting *Delaney v. Superior Court* (1990) 50 Cal.3d 785, 800.) Since there is no evidence that voters intended *not* to produce the effect in question, courts have no legitimate alternative but to give effect to the statute as it is written.

### 2. Ballot Pamphlet as Sole Evidence of Voter Understanding.

If further inquiry into voter intentions were warranted, there would be no sound reason to confine it to the contents of the ballot pamphlet, which are constrained by considerations of space, time, and subjective determinations of materiality. The official summary of any ballot measure is authored by the office of the Legislative Analyst. (Elec. Code, §§ 9087, 9086, subd. (b).) The summary is required only to "generally set forth in an impartial manner the information the *average voter* needs to *adequately understand* the measure." (Elec. Code, § 9087, subd. (b), italics added.) Note the absence of any directive that the Legislative Analyst attempt to provide voters with a *complete* understanding of the measure, which would be a practical impossibility in any event; few judges or lawyers would be so arrogant as to profess that they *completely* understand any provision of law, at least in the sense of being able to forecast all of its effects. (See *In re Gabriel G.*, *supra*, 134 Cal.App.4th at p. 1437 ["Legislation often has unintended consequences."].) In manifest recognition of this fact, the governing statute states only that the ballot summary "*may* contain" such "background information" as "the effect of the measure on existing law." (Elec. Code, § 9087, subd. (b), italics added.) The Legislative Analyst is thus called upon only to make a rational judgment about what effects are *most likely to matter to voters*, and to describe them in a fair and intelligible

16

way. Inherent in this undertaking is the necessity of informational triage—of determining what details are necessary to form an "adequate[] understanding[ing]," and what details may be omitted. The preparer of such a summary necessarily exercises a discretionary function requiring courts to allow considerable latitude when the result is challenged as incomplete or inaccurate. (See *Brennan v. Board of Supervisors* (1981) 125 Cal.App.3d 87, 96 ["Faced with the difficult task of simplifying a complex proposal, the Committee drafted a summary which, if not all-encompassing, at least briefly described its major subjects."].)

When the Legislative Analyst fails to mention some effect of a ballot measure, it remains open to the measure's official proponents and opponents to use their space in the ballot pamphlet to supply any perceived lack. But they too must practice triage; their arguments are restricted to 500 words to open and 250 words in rebuttal. (See Elec. Code, §§ 9062, 9069, cf. *id*., § 9041.)[11] This means the advocates must select a limited

---

[11] There seem to be a number of lacunae in the statutes governing ballot arguments. The cited sections appear in Article 6 of Chapter 1 of Division of the Elections Code, which is entitled "Arguments Concerning Measures Submitted to Voters," and which seems to address only situations where no supporting or opposing argument has otherwise been submitted. There are two references to a "time limit" for submission of arguments by other members of the public (Elec. Code, §§ 9062, subd. (c), 9064), but we find no other statute or regulation prescribing such a limit. A chapter seemingly addressed to non-initiative measures includes a requirement that supporting and opposition arguments be "submitted to the Secretary of State" by a date "to be designated" by that officer. (Elec. Code, § 9043.) Another statute provides that if arguments are not submitted by legislators, they may be submitted by interested voters "by a date sufficient to meet ballot printing deadlines." (Elec. Code, § 9044.) The Secretary of State is required to begin publicizing the printed pamphlet at least 45 days before the election. (Elec. Code, § 9094, subd. (b).) The materials constituting the ballot must be delivered to the state printing office "at least 40 days prior to the date for required delivery to the elections officials as provided in Section 9094." (Elec. Code, § 9082.) And the proposed contents must be made available for public inspection at least 20 days before delivery to the printer. (Elec. Code, §§ 9092, 88006.) This suggests that arguments must be submitted to the Secretary of State at least 105 days before the

17

number of points to include in their ballot pamphlet arguments, relying on other media to pursue issues deemed of lesser moment. Here, both sides evidently concluded that the effect of section 1170.18(c) on Proposition 36 petitions was not a powerful enough ground of argument to warrant mention in the pamphlet. That decision can hardly furnish an occasion for judicial nullification.

### 3. Public Debate.

As already noted and as reflected in the Appendix, Proposition 47 aroused a great deal of public debate. Much of it was devoted to various aspects of the measure's prospective reclassification of specified offenses to misdemeanors. But opponents of the measure also sought to publicize its narrowed definition of dangerousness and the effect that definition would have on other proceedings, specifically including petitions for resentencing under the Reform Act. Thus one opposition Web site, as archived 36 days before the election placed this effect at the top of a list of reasons to vote against the measure: "Prop 47 will release dangerous Three Strikes inmates. Prop 47 goes far beyond petty crimes. It rewrites our laws to make it easier for violent Three Strikes felons to gain early release. [¶] The Three Strikes reform law (Proposition 36) allowed certain Three Strikes prisoners to petition for early release, as long as they did not pose 'an unreasonable risk of danger to public safety.' [¶] *Prop 47 would rewrite California law, including the Three Strikes Reform law, to give the term 'unreasonable risk of danger to public safety' a very narrow definition*. [¶] Under the Prop 47 definition, only an inmate likely to commit murder, rape, or a handful of other rare crimes like possession of a weapon of mass destruction can be kept behind bars as a danger to public safety. [¶] If Prop 47 passes, violent Three Strikes inmates who might commit robbery, assault with

election. However we have found no indication of any deadline that officer may actually have set with respect to the November 2014 election.

18

a deadly weapon, felony child abuse, arson, kidnapping, spousal abuse, child abduction, carjacking, and scores of other serious felonies will no longer be defined as 'dangerous' under California law.  If the inmate is eligible for early release under either Prop 47 or the Three Strikes Reform law, the court will be powerless to stop it."  (Facts - No on Prop 47 (archived Sept. 28, 2014) <https://web.archive.org/web/20140928005627/http://votenoprop47.org/No_On_Prop_47__Facts.html> (as of Jun 6, 2016).)[12]

Another opposition Web site, accessible only in archived form, listed the effect on Reform Act petitions in a table, as follows (CALIFORNIANS AGAINST PROP. 47 | No on Proposition 47 (archived Oct. 8, 2014) <http://web.archive.org/web/20141008185016/http://californiansagainst47.com/> (as of Jun. 20, 2016).):

| Current Law | Proposition 47 | Implications |
|---|---|---|
| Under the Three Strikes Reform Act of 2012 (Proposition 36), Penal Code § 1170.126 provides for resentencing petitioners previously sentenced to life terms pursuant to the Three Strikes Law (Penal Code §§ 667(b)-(i) and 1170.12) whose committing offense was non-violent and non-serious. | The proposed language in Penal Code § 1170.18(c) would require the prosecution to prove, and the court to find, that the defendant is an unreasonable risk to society because he or she would likely commit a sexually violent offense, murder, certain sex crimes with children under 14, solicitation to commit murder, assault with a machine gun on a peace officer, possession of weapons of mass destruction or a crime punishable by death or life imprisonment. | Many potentially violent individuals will be released–not because they do not pose a violent risk to society, but because the Act has unreasonably limited the scope of what is considered a risk of danger to society and what the prosecution can present to counter the defendant's eligibility. |

Another archived page on the same website recapitulated criticisms leveled against Proposition 47 by the California District Attorneys Association (CDAA):  "[T]he Three

---

**12** This same language continued to appear in versions of the cited web page archived as recently as April 14, 2016.  (Facts – No on Prop 47 <https://web.archive.org/web/20160414023618/http://votenoprop47.org/No_On_Prop_47__Facts.htm> (as of Jun. 20, 2016).)  Between that date and May 31, 2016, the page was apparently modified to remove all references to Proposition 36.  (See Facts – No on Prop 47 <https://web.archive.org/web/20160531140507/http://votenoprop47.org/No_On_Prop_47__Facts.html> (as of Jun. 20, 2016); Facts – No on Prop 47 <http://www.votenoprop47.org/No_On_Prop_47__Facts.html> (as of Jun. 20, 2016) [original website].)

19

Strikes Reform Act of 2012 . . . provides for resentencing petitioners previously sentenced to life terms pursuant to the Three Strikes Law [citations] whose committing offense was non-violent and non-serious.  Penal Code §1170.126 requires that when a petitioner meets the basic criteria for eligibility, the court shall resentence the offender unless the petitioner poses 'an unreasonable risk of danger to public safety.' . . . Although this is a demanding standard, it provides a fair balance and allows the prosecution and court to rely on several sources and areas of risk to establish that the individual is unsuitable for resentencing.  [¶]  Penal Code § 1170.18 . . . changes that standard to an altogether unreachable level.  [It] . . . would require the prosecution to prove, and the court to find, that the defendant is an unreasonable risk to society because he would likely commit one of the listed violent crimes in § 667(e)(2)(C)(iv). [¶] . . . [¶]  Further, *this proposed new definition of 'dangerousness' is not limited to only the types of offenders serving terms for crimes affected by this Act, but applies to any resentencing permitted by the Penal Code*.  Proposed Penal Code § 1170.18(c) states, 'As used throughout this Code, "unreasonable risk of danger to public safety["] means an unreasonable risk that the petitioner will commit a new violent felony within the meaning of [§ 667(e)(2)(C)(iv)].'  (§ 1170.18, subd. c [emphasis added].)  *By referring to 'Code,' § 1170.18 would alter the meaning of 'unreasonable risk of danger to public safety,' not only as it is applied in § 1170.18 resentencing hearings, but in all other hearings that rely on the dangerousness standard throughout the entire Code.*  As a result, the prosecution would face the impossible barrier when opposing *resentencing for the Three Strikes defendants under Penal Code § 1170.126*.  [¶]  Moreover, for [*sic*] *any of the Three Strikes defendants previously denied resentencing based upon a judicial finding of dangerousness, may appeal that ruling and request the court now apply this new standard of dangerousness*, resulting in a further cost to a court system already struggling

20

financially." (CALIFORNIANS AGAINST PROP. 47 | About Proposition 47 (archived Oct. 10, 2014) <https://web.archive.org/web/20141010054701/ http://californiansagainst47.com/about-proposition-47/> (as of Jun. 20, 2016), italics added; see Proposition47_A_Cruel_Fraud.pdf, <http://www.co.mendocino.ca.us/da/pdf/ Proposition47_A_Cruel_Fraud.pdf> (as of Jun 20, 2016) [apparent copy of CDAA report]; Proposition 47: A Cruel Fraud <http://docplayer.net/1464582-Proposition-47-a-cruel-fraud.html> (as of Jun. 20, 2016) [same].)

Nor did these arguments appear only on opponents' Web sites. A Davis newspaper ran an op-ed piece by a superior court judge enumerating several perceived flaws in the Neighborhoods Act. "Most significantly," he wrote, "Prop. 47 expands the resentencing provisions under the three-strikes law. Prop. 36, enacted by the voters in 2011 [*sic*], permits resentencing of certain strike offenders, unless to do so would create an 'unreasonable risk of danger to public safety.' Broad discretion was given to judges to determine who would pose such a danger. [¶] *Prop. 47 imposes its more restrictive definition of dangerousness on people sentenced under the three-strikes law. People now serving a third-strike sentence will be allowed to submit a request for resentencing under the more liberal provisions of Prop. 47, even though a judge has already determined they are too dangerous to get relief under the existing law.*" (Couzens, Prop. 47: a perspective from the bench (Oct. 28, 2014) <http://www.davisenterprise.com/forum/opinion-columns/prop-47-a-perspective-from-the-bench/> (as of Jun. 20, 2016); see Print, <http://www.davisenterprise.com/print/?edition=2014-10-28&ptitle=A6> (as of Jun. 20, 2016 [facsimile of print edition]; D. Greenwald, Analysis: Perspectives on Proposition 47 (Oct. 29, 2014) Davis People's Vanguard <http://www.davisvanguard.org/2014/10/analysis-perspectives-on-proposition-47/> (as of Jun. 20, 2016) [discussing Couzens article and noting effect on Reform Act petitions].)

21

The Web sites for several newspapers published an opinion piece, typically signed by local law enforcement officials, echoing the opposition website first quoted above: "This deceptive proposition also rewrites our laws to make it easier for violent Three Strikes inmates to gain early release.  The Alliance for a Safer California says, 'The Three Strikes reform law (Proposition 36) allowed certain Three Strikes prisoners to petition for early release, as long as they did not pose "an unreasonable risk of danger to public safety." '  [¶]  *Prop 47 would rewrite California law, including the Three Strikes Reform law, to give the term 'unreasonable risk of danger to public safety' a very narrow definition.*  Under the Prop 47 definition, only an inmate likely to commit murder, rape, or a handful of other rare crimes (like possession of a weapon of mass destruction) can be kept behind bars as a danger to public safety.  [¶]  If Prop 47 passes, violent Three Strikes inmates who commit robbery, assault with a deadly weapon, felony child abuse, arson, kidnapping, spousal abuse, child abduction, carjacking, and scores of other serious felonies will no longer be defined as "dangerous" under California law."  (Our Readers Say: Police, sheriffs say no to Prop 47 (Oct. 24, 2014) <http://www.redlandsdailyfacts.com/opinion/20141024/our-readers-say-police-sheriffs-say-no-to-prop-47> (as of Jun. 20, 2016), italics added; see San Bernardino County Police Chiefs and Sheriff's Association says:  No on Prop 47 – Highland Community News: Opinion (Oct. 24, 2014) <http://www.highlandnews.net/opinion/san-bernardino-county-police-chiefs-and-sheriff-s-association-says/article_1d3fb9f8-5bc3-11e4-8c0f-47ac194ced49.html> (as of Jun. 20, 2016); County police chiefs, sheriff's say no on 47 - Opinion - VVdailypress.com - Victorville, CA (Oct. 27, 2014) <http://www.vvdailypress.com/article/20141027/OPINION/141029812> (as of Jun. 20, 2016.)[13]

---

[13]  Our researches are necessarily confined to web-accessible sources.  We have no way of knowing to what extent voters were exposed to similar information through more ephemeral media such as broadcasting, mailings, handbills, or flyers.  (See Prop. 47

Two of the three signatories to the opposition argument in the ballot pamphlet were associated with public opposition on this ground.  (See Ballot Pamp., General Elec. (Nov. 4, 2014) (2014 Ballot Pamphlet), argument against Prop. 47, p. 39 <http://vig.cdn.sos.ca.gov/2014/general/en/pdf/proposition-47-arguments-rebuttals.pdf> (as of Jun. 20, 2016).)  One, Christopher W. Boyd, was identified in the pamphlet as "President, California Police Chiefs Association [(CPCA)]."  (*Ibid*.)  The other, Gilbert G. Otero, is named as "President, California District Attorneys Association [(CDAA)]."  (*Ibid*.)  According to online records of campaign contributors, CPCA contributed to the lead opposition entity, Californians Against Proposition 47 (CAP47).  (California Secretary of State – CalAccess – Campaign Finance <http://cal-access.ss.ca.gov/ Campaign/Committees/Detail.aspx?id=1368083&session=2013&view=received> (as of Jun. 20, 2016).)  CAP47 created a website in opposition to the measure, including the page described above, which sets forth what it describes as an "extensive evaluation of Proposition 47 from the [CDAA]."  (Californians Against Prop. 47 | About Proposition 47 (archived Oct. 5, 2014) <https://web.archive.org/web/20141010054701/ http://californiansagainst47.com/about-proposition-47/> (as of Jun. 20, 2016.)

It thus appears that one opposition author was president of an organization that wrote and circulated a paper specifically attacking Proposition 47 for its effect on Reform Act petitions—including those that had already been adjudicated.  Another opponent was president of an organization that contributed to an entity whose Web site highlighted that

would cut penalties for 1 in 5 criminals in California - LA Times (Oct. 11, 2014) <http://www.latimes.com/local/politics/la-me-ff-pol-proposition47-20141012-story.html> (as of Jun 20, 2016 [opponents "have reported raising $288,000 for the No campaign, most of it earmarked to go to companies that send out campaign mail"].)  As just noted, for example, highly relevant articles appeared in online versions of the Redland Daily Facts, the Highland Community News, and the Victorville Daily Press. While it seems likely that these articles also appeared in the print editions of those publications, we have no way of testing that supposition.

effect as a reason to vote no. Their failure to cite this effect in the ballot pamphlet supports an inference, not that the effect was too obscure to be noticed, but that opponents did not think it a powerful enough argument for inclusion in the limited space available to them. This in turn suggests that by invalidating the plainly expressed will of the voters, we would be handing opponents of the measure a victory they could not, and knew they could not, win at the ballot box.

In any event, given this public opposition to the measure on the very grounds at issue here, it simply cannot be said that voters were unaware of the challenged effect when they adopted Proposition 47. The reality of course is that some voters were aware of it and some were not. It is no proper role of the courts to guess at these numbers or to impose thresholds of voter comprehension which must be met to our satisfaction before we will carry out the terms of voter-enacted legislation. We are constrained by the separation of powers to trust not only the ballot pamphlet, but arguments in the public marketplace of ideas, to ensure that adopted measures reflect the actual will of the voters. In the absence of absurdity, constitutional infirmity, or frustration of an affirmatively manifested purpose, a voter-adopted statute must be given effect according to its plain meaning.

### D. *"Illogical Timing."*

The no-longer-citable decision incorporated in respondent's brief asserts that Proposition 47's "timing" made it "illogical" to suppose that section 1170.81(c) would apply to Reform Act petitions: " 'The Reform Act required petitions to be brought within two years unless a court concluded that there was good cause for a late-filed petition. ([Pen. Code,] § 1170.126, subd. (b).) By the time Proposition 47 took effect, only two days remained in the two-year period for filing a Reform Act petition. No rational voter

24

could have intended to change the rules for Reform Act petitions at the last moment, when nearly all petitions would already have been filed and most of them adjudicated."

We find this argument badly flawed at multiple levels. In the first place, courts cannot deny effect to plain statutory language merely because they find it "illogical" in some unexplained way. The most nearly apposite rule, noted above, is that plain language may be overlooked when its literal application would produce *absurd* results. (*California Highway Patrol v. Superior Court* (2008) 158 Cal.App.4th 726, 736 ["The literal meaning of unambiguous statutory language 'may be disregarded to avoid absurd results . . . .'"]; *Amador Valley*, *supra*, 22 Cal.3d 208, 245 [acknowledging rule in context of initiative effecting sweeping constitutional amendment].) The underlying rationale is that the Legislature cannot have intended to bring about an absurdity, so if a literal application has that effect, the statute must fail to accurately express the Legislature's true intent. (See *Sterling Park, L.P. v. City of Palo Alto* (2013) 57 Cal.4th 1193, 1203 [proposed interpretation "would lead to absurd results the Legislature cannot have intended"]; *Fireman's Fund Ins. Co. v. Superior Court* (2011) 196 Cal.App.4th 1263, 1281, fn. omitted ["We cannot conclude that our Legislature intended such absurd results."]; *Simmons v. Ghaderi* (2008) 44 Cal.4th 570, 586 [unambiguous statutes must be applied as written "unless the statutes cannot be applied according to their terms or doing so would lead to absurd results, thereby violating the presumed intent of the Legislature"].)

There is nothing even remotely "absurd" about giving effect to the definition in section 1170.18(c) according to its plain meaning. Indeed, we see nothing illogical about it. Where we do find patent illogic is in the tacit, unexplained assumption—contrary to the opinions of the measure's opponents, as described above—that the newly adopted definition of dangerousness could only apply in cases not yet filed or, at most, not yet adjudicated. The quoted decision acknowledged, only to ignore, the flexible deadline for

25

Proposition 36 petitions, i.e., "within two years after the effective date of the act that added this section *or at a later date upon a showing of good cause*." (Pen. Code, § 1170.126, subd. (b), italics added.) We think it highly likely that the adoption of a new standard governing dangerousness determinations, if otherwise applicable to a petition, would be held to provide "good cause" for its later presentation. But the question is almost certainly academic because it is probably true that, as the quoted decision acknowledged, nearly all Proposition 36 petitions would already have been filed when Proposition 47 took effect.[14] The two-year limitation could have no impact on those petitions because they had been filed within the allotted time. All or nearly all of those petitions were probably on appeal when Proposition 47 took effect. The question before voters, then, was not whether any Proposition 36 petitions remained unadjudicated but whether the benefits of the new definition should extend to petitions that *had* already been adjudicated. We discuss that question in part I(F), *post*.

### E. Finality of Judgments.

Respondent also adopts a passage from the above-mentioned uncitable decision in which the court concludes that literal application of section 1170.18(c) is barred by another subdivision of the same section declaring that "[n]othing in this and related sections is intended to *diminish or abrogate the finality* of judgments in any case *not falling within the purview* of this act." (Pen. Code, § 1170.18, subd. (n)

---

[14] Of course, the court's implicit admission that a few petitions might remain unfiled or unadjudicated is also fatal to its reasoning. A statute cannot be denied effect on the ground that a court finds the number of beneficiaries too small to justify relief. There is nothing "illogical" about extending a remedy to less than the entire universe of persons to whom it might have been extended. Nor is there anything "practical" about refusing effect to a provision that, by its plain terms, has such an effect. That there are too few life rafts means some may drown, not that all must do so. A contrary conclusion would require a far more substantial explanation than appears in the quoted decision.

26

(§ 1170.18(n)).)[15]  The first flaw in this reasoning is that insofar as section 1170.18(c) applies to petitions brought under the Reform Act, those petitions are within the statute's "purview," i.e., its "limit, purpose, or scope."  (Merriam-Webster's Collegiate Dict. (10th ed. 1999) p. 950.)  Second, the application of section 1170.18(c) to Reform Act petitions does not "diminish or abrogate the finality of judgments" in those cases.  If defendant's petition here is ultimately granted, whether or not section 1170.18(c) plays a material role in that outcome, it will be the Reform Act itself that has "diminish[ed] or abrogate[d] the finality" of his conviction by requiring that he be resentenced unless found to present an unreasonable danger.  Proposition 47 now supplies the test to be applied in determining the latter issue, but it is not Proposition 47 that impairs the finality of his original conviction.  That is the Reform Act's doing.  The petitioner in such a case is not invoking Proposition 47 as a basis to reopen or attack the judgment, but as the source for the rule of decision governing a subsidiary issue, in accordance with Proposition 47's plain terms.  Complying with that mandate does not "diminish or abrogate" the original judgment, even if it proves dispositive of the petition.  It is still the Reform Act, not Proposition 47, that impairs the finality of his sentence.

Had the drafters and voters intended to achieve the result urged by respondent, they could have simply replaced "throughout this Code" with "in this act" in section 1170.18(c).  We must give effect to all of the language chosen by the voters, including the directive that section 1170.18(c)'s definition of dangerousness govern determinations of that issue in Proposition 36 proceedings.

---

[15]  The quoted passage states, " 'Applying section 1170.18, subdivision (c)'s definition throughout the Penal Code would necessarily 'diminish or abrogate the finality of judgments' in cases, like those subject to the Reform Act, that do not fall 'within the purview of' Proposition 47.  Defendant's petition under the Reform Act, like most such petitions, seeks to abrogate the finality of a Three Strikes judgment in a case that does not involve one of the . . . crimes [specified in Proposition 47]. Thus, under section 1170.18, subdivision (n), '[n]othing' in section 1170.18 was intended to apply to his petition.' "

We conclude that section 1170.18(c) applies to Reform Act petitions by its terms and that no meritorious ground has been cited for departing from the plain meaning of those terms. This brings us to the question whether application of that provision to this particular case would offend the presumption against giving retroactive effect to statutory provisions.

### F. *Retroactive Effect.*

#### 1. Effect of *Estrada* and *Brown*.

In his opening brief defendant anticipated an objection based on the presumption against retroactivity, as follows: "The general rule is that a new statute which lessens punishment will be applied to a non-final judgment. (*In re Estrada* (1965) 63 Cal.2d 740, 748 (*Estrada*).) The exception to the rule is that a statute will not be given retroactive effect when it contains a savings clause. (*Id.*) In this instance, there is no savings clause in section 1170.18 with respect to the operation of the new definition of 'unreasonable risk of danger to public safety.' "

Respondent counters that the absence of an express retroactivity clause renders section 1170.18(c) unavailable to persons in defendant's position, and that *Estrada* was inapplicable in light of its interpretation in *People v. Brown* (2012) 54 Cal.4th 314, 324-325 (*Brown*).

The briefs thus echo a number of cases which have addressed the question of retroactivity as if it were a matter of choosing between *Estrada* and *Brown*. We find this framing of the issue inadequate. In *Estrada*, while the defendant was awaiting sentencing for an escape from custody, the underlying statute was amended to reduce the minimum sentence and eliminate a restriction on parole eligibility. The court held that he was entitled to the benefit of the amendment: "When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for

28

the commission of the prohibited act. It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply. The amendatory act imposing the lighter punishment can be applied constitutionally to acts committed before its passage provided the judgment convicting the defendant of the act is not final. This intent seems obvious, because to hold otherwise would be to conclude that the Legislature was motivated by a desire for vengeance, a conclusion not permitted in view of modern theories of penology." (*Estrada*, *supra*, 63 Cal.2d 740, 745.)

For some time, *Estrada* was understood to create a presumption, counter to a more general presumption against statutory retroactivity, that a penal statute reducing criminal penalties would operate in favor of all defendants whose convictions were not yet final. (See 1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Introduction to Crimes, § 49, pp. 89-90.) However, *Brown* placed an important limitation on this counter-presumption. (*Brown*, *supra*, 54 Cal.4th 314.) The defendant there sought to take advantage of a liberalized formula for calculation of conduct credits for confinement in local custody. Finding no indication that the Legislature intended to grant credits retroactively, the court held that the statute operated to increase credits only for time in custody after its effective date. The defendant argued, among other things, that a contrary conclusion was warranted by *Estrada*. The court limited *Estrada*'s counter-presumption to cases where a statute "mitigat[es] the punishment for a *particular criminal offense*." (*Id.* at p. 324, italics added.)

Assuming this limitation operates here to make *Estrada* inapplicable, it means only that *Estrada*'s presumption in *favor* of retroactive application does not aid defendant. It does not follow that the statute does not operate retroactively. As the *Brown* court acknowledged at the outset of its analysis, "Whether a statute operates prospectively or retroactively is, at least in the first instance, a matter of legislative

29

intent." (*Brown*, *supra*, 54 Cal.4th at p. 319; see *People v. Nasalga* (1996) 12 Cal.4th 784, 792 ["To ascertain whether a statute should be applied retroactively, legislative intent is the 'paramount' consideration."]; *Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1206 ["Because the question whether a statute is to apply retroactively or prospectively is, in the first instance, a policy question for the legislative body which enacts the statute, before reaching any constitutional question we must determine whether, as a matter of statutory interpretation, Proposition 51 should properly be construed as prospective or retroactive."].) It thus remains to determine whether the presumption against retroactive effect applies here or whether the presumption is overcome by evidence of legislative intent to the contrary. *Estrada*'s counter-presumption need not, and does not, enter into our analysis.

We have concluded that section 1170.18(c) must be held available to defendant and others in his position for at least seven partly interlocking reasons: (1) the language and structure of section 1170.18, subdivisions (b) and (c), strongly indicate that they were *deliberately aimed at Proposition 36 petitions*, with the intention of reducing the number of denials of relief in those cases; (2) such a purpose implies a legislative finding that the prior regime was unduly restrictive, resulting in the denial of relief where relief should have been granted; (3) failing to apply the statute to cases such as this one would largely or entirely thwart the intent thus manifested, because all or nearly all petitions that could have been brought under Proposition 36 would have already been heard when the new definition took effect; (4) to the extent the statute might still reach a few unadjudicated petitions, it would be absurd to reward them for delayed filing while punishing prisoners who acted speedily to seek relief under Proposition 36; (5) the overarching purposes of both Proposition 36 and Proposition 47 support the conclusion that the latter's modification of the former was intended to operate retroactively; (6) retroactive effect would also ensure that Proposition 36 achieved the cost savings it was intended to yield;

30

and (7) the statute was ameliorative or curative in intent, i.e., it was designed to remedy an undesirable consequence of prior law, and this characteristic also favors retroactive application;

## 2. Presumption Against Retroactivity.

It is a longstanding presumption in Anglo-American law that statutes operate only prospectively unless a contrary intent clearly appears. (See *U.S. v. Heth* (1806) 7 U.S. 399, 413 (opn. of Paterson, J.) ["Words in a statute ought not to have a retrospective operation, unless they are so clear, strong, and imperative, that no other meaning can be annexed to them, or unless the intention of the legislature cannot be otherwise satisfied."].) California law as pronounced by our Supreme Court seems to diverge from the common-law presumption in a number of respects. However that is the law by which we are bound, and which we shall undertake to apply.

California courts have pronounced a number of competing and even conflicting rules for determining whether applying a statute to a given case contravenes the presumption. We extract from these cases the principle that a statute will be denied effect in a given case if (1) the effect would be " 'retroactive' " for purposes of the presumption; and (2) an intent to bring about such an effect is not clearly manifested in the statute. (See *Brown* (2012) 54 Cal.4th 314, 319, quoting *Evangelatos v. Superior Court, supra,* (1988) 44 Cal.3d 1188, 1208 [presumption is negated by " ' "express language or [a] clear and unavoidable implication" ' " of intent to operate retroactively]; cf. *ibid.*, quoting *Evangelatos v. Superior Court*, *supra*, at pp. 1208-1209 [" 'in the absence of an express retroactivity provision, a statute will not be applied retroactively unless it is very clear from extrinsic sources that the Legislature . . . must have intended a retroactive application' "].)[16]

_____

[16] The the last-quoted passage is potentially mischievous if taken to require *extrinsic* evidence of retroactive intent whenever lawmakers fail to expressly declare such

31

We will assume for purposes of our analysis that applying section 1170.18(c) to defendant's petition would indeed constitute a retroactive effect subject to California's version of the common-law presumption. We note, however, that this proposition is not readily harmonized with the presumption's rationale. (See *Sekt v. Justice's Court of San Rafael Tp.* (1945) 26 Cal.2d 297, 308 ["Where the reason for the rule ceases the rule should not apply."]; Civ. Code, §§ 3510, 3511.) The common-law presumption is generally understood to rest on the same principle as the constitutional prohibitions against ex post facto laws and laws impairing the obligation of contracts: there is a great risk of *unfairness* in applying a new law so as to *diminish rights* or *enlarge obligations* that arose prior to the enactment of the law. (See *California Trout, Inc. v. State Water Resources Control Bd.* (1989) 207 Cal.App.3d 585, 609, italics added ["Application of a statute is retroactive only when it gives a different and *potentially unfair* legal effect to actions taken in reliance on the preenactment law."]; *Mahon v. Safeco Title Ins. Co.* (1988) 199 Cal.App.3d 616, 620-621, ["The point of the rule disfavoring retroactivity is to avoid the unfairness that attends changing the law after action has been taken in justifiable reliance on the former law. [Citation.] Hence, the characterization of the application of a statute as retroactive depends on the propensity for unfairness."].)[17] Thus

intent. Such a rule would imbue "extrinsic sources" with a greater dignity than the text itself. To illustrate its unsoundness one need only posit a measure awarding cash grants to the victims of a natural disaster, but failing to declare itself retroactive. Such a statute must clearly operate retroactively, at least in the same sense and to the same extent as the statute now before us; otherwise it cannot operate at all. To require "extrinsic sources" to this effect would be absurd. What is apparently meant by the quoted language is that extrinsic sources *alone* cannot justify retroactive operation unless they do so very plainly.

[17] The leading treatise on statutory construction likewise notes that the common-law presumption rests on a perception that "retroactive application of new laws is usually unfair." (2 Singer et al., Sutherland Statutes and Statutory Construction (7th ed. 2009) (Sutherland), § 41:2, p. 386, fn. omitted, italics added.) It describes the scope of the presumption as depending on "under what circumstances, for what purposes, with what effects, and to what extent, unfairness results from the time frame within which a

the presumption has often been described as arising only when a statute *impairs rights* or *enlarges liabilities* that arose under prior law. (*I.N.S v. St. Cyr* (2001) 533 U.S. 289, 321 ["A statute has retroactive effect when it ' "takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past." ' "]; *Landgraf v. USI Film Products* (1994) 511 U.S. 244, 267 ["When . . . the statute contains no . . . express command, the court must determine whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed."].)

It is difficult to see how a statute reducing punishment for past convictions can ever be said to "impair a right a party possessed," "increase a party's liability for past conduct," or "impose new duties" on anyone. (See Sutherland, *supra*, § 41:2, p. 389, fn. omitted ["It is not unfair for a law retroactively to confer *benefits* . . . unless it arbitrarily deprives some people of the benefits."].) Nonetheless California cases, particularly in the criminal context, have repeatedly applied a presumption against statutory retroactivity without regard to whether it impaired anyone's rights, enlarged anyone's liabilities, or otherwise inflicted any appreciable harm on anyone, unfairly or otherwise. (See, e.g., *People v. Harmon* (1960) 54 Cal.2d 9, 25-26 [presumption barred defendant from invoking later reduction in punishment for offense of which he was convicted]; *Estrada*,

retroactive statute exerts its influence. Retroactivity may be a factor in court decisions in either of two ways. It may be asserted that an act's retroactivity makes it so unfair as to render it invalid on constitutional grounds. Or, the unfairness that would attend retroactive application may be a reason to construe it only prospectively." (Sutherland, *supra*, § 41:2, p. 391, fns. omitted; see *id.*, § 41:5, p. 439, fn. omitted ["Even where a constitution explicitly and unqualifiedly prohibits enactment of retrospective statutes, courts usually strike down only those statutes whose retroactivity results in measurable unfairness."].)

*supra*, 63 Cal.2d at p. 742 [overruling *Harmon* while endorsing general applicability of presumption]; *Brown*, *supra*, 54 Cal.4th 314 [applying presumption to statute increasing conduct credits]; but see *Tapia v. Superior Court, supra,* 53 Cal.3d 282, 300-301 [withholding presumption from statutory amendments benefiting defendants].)[18] Under constraint of these authorities we will assume arguendo that the effect sought by defendant—to apply section 1170.18(c)'s dangerousness test to his petition—is subject to the statutory presumption. We nonetheless find the presumption rebutted by clear evidence that section 1170.18(c) was intended to apply to cases such as defendant's.

### 3. Statutory Text.

We find in the text of section 1170.18, subdivisions (b) and (c), several clear manifestations of an intention to reach petitions for resentencing not only under Proposition 47 but also under the Reform Act. The most obvious of these is the declaration that the new test of dangerousness is to apply "throughout this Code." (§ 1170.18(c).) The defined phrase ("unreasonable risk of danger to public safety") appears at only one other location in the Penal Code: section 1170.126(f), which governs petitions for resentencing under the Reform Act. The enunciation of a definition to apply "throughout this Code" can only have been intended to reach those proceedings.

This conclusion is reinforced by further examination of the relevant language. It will be recalled that as adopted, the Reform Act required resentencing unless the court determined that it would pose "an unreasonable risk of danger to public safety." (§ 1170.126(f).) This language was understood to vest trial courts with "broad discretion

---

[18] To be sure, our Supreme Court has sometimes used language echoing the narrower conception of what effects will trigger the presumption against retroactivity. (See *Californians For Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 231 [acknowledging argument that application of law would not be " 'retroactive,' as we have defined the term, because such application does not change the legal consequences of past conduct by imposing new or different liabilities based upon such conduct"].)

to find dangerousness." (*Esparza, supra,* 242 Cal.App.4th 726, 739; cf. *People v. Flores* (2014) 227 Cal.App.4th 1070, 1074-1075 [rejecting vagueness challenge].)

The drafters of Proposition 47 manifestly concluded that a narrower test was needed. They thus mandated resentencing unless the court found "an unreasonable risk that the petitioner will commit a new *violent felony* within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667." (§ 1170.18(c), italics added.) But if their intent was only to make this the test governing Proposition 47 petitions, they could have simply incorporated it directly into section 1170.18(b). Instead they first borrowed the exact phrase used in Proposition 36, and then *redefined* that phrase to give it a new meaning (§ 1170.18(c).) There was no reason to incorporate the earlier phrase if the intent was only to grant narrower discretion under Proposition 47 than courts were exercising under the Reform Act. Such a regime would require only that section 1170.18(b) mandate resentencing unless the court found an unreasonable risk that the petitioner would commit a violent felony. In other words, the old phrase could simply have been replaced by the new one. This was the most obvious way to draft the statute—assuming an intent to apply only to Proposition 47 cases—and it would have had at least three virtues: simplifying section 1170.18 by eliminating any need for a separate definition, shortening it by omitting subdivision (c), and obviating any confusion over the applicability of the new test to Reform Act petitioners. That the drafters instead lifted the operative language from the Reform Act and then *redefined* it in a substantially narrower way is an indication that their very purpose was to *alter the rule in Reform Act proceedings* so as to constrain the discretion courts had been exercising in those cases, and to correct the resulting denials of relief.

"[I]n reviewing the text of a statute, [courts] must follow the fundamental rule of statutory construction that requires [that] every part of a statute be presumed to have some effect and not be treated as meaningless unless absolutely necessary. 'Significance

35

should be given, if possible, to every word of an act. [Citation.] Conversely, a construction that renders a word surplusage should be avoided. [Citations.]' [Citations.]" (*People v. Arias* (2008) 45 Cal.4th 169, 180.) Here, the construction advocated by respondent would render not merely a word, but an entire phrase superfluous. If Proposition 47 does not alter the standard applicable in Proposition 36 cases, the phrase "unreasonable risk of danger to public safety" performs no useful function in Proposition 47; its only effect is to needlessly complicate and lengthen the statute. By understanding that phrase as directly aimed at Proposition 36 proceedings, we give it the only meaning and effect it can have. We conclude that its very purpose is to correct an unduly parsimonious judicial treatment of Proposition 36 petitions. As will appear, that intent compels the conclusion that it was also intended to govern petitions that had already been filed and denied in the trial court.

### 4. Overarching Retroactive Intent.

The resentencing provisions in both Proposition 36 and Proposition 47 were *explicitly* retrospective in intent. Both measures pointedly relieved current prisoners of penalties duly imposed on them under prior law. (See *People v. Scarbrough, supra,* 240 Cal.App.4th 916, 926-927 ["section 1170.18 codifies the voters' intent to retroactively reduce properly imposed punishment for certain criminal offenders"].) Each reflected a judgment by the electorate that the prison population included inmates who *should not be there*, or should not long remain, because they had been imprisoned for life on nonviolent offenses (Proposition 36) or because they were imprisoned for "petty" offenses (Proposition 47). The proponents of Proposition 36 argued, and voters impliedly found, that these remissions of sentence were necessary to "MAKE THE PUNISHMENT FIT THE CRIME" and thereby conserve "[p]recious financial and law enforcement resources" that were being "improperly diverted to impose life sentences for some non-violent offenses." (Ballott Pamp., Gen. ELec. (Nov. 6, 2012) text of Prop. 36, at p. 52.)

36

This point was repeated in the rebuttal to the opponents' argument, along with the statement, "People convicted of shoplifting a pair of socks, stealing bread or baby formula *don't deserve life sentences*." (*Id*. at p. 53, italics added.) The same intent is expressed, more frequently if somewhat less directly, in the arguments supporting Proposition 47, i.e., it would "[s]top[] wasting prison space on *petty crimes* and focus[] law enforcement resources on violent and serious crime by changing *low level nonviolent crimes* such as simple drug possession and petty theft from felonies to misdemeanors." (Ballott Pamp., Gen. Elec. (Nov. 4, 2014) text of Prop. 47 at p. 38, italics added; see *ibid.*, italics added ["Stops wasting money on warehousing people in prisons for *nonviolent petty crimes*"; *id.* at p. 39 [rebuttal: "Stops wasting prison space on *petty crimes*"].) (Italics added.)

In enacting these two initiatives, voters clearly intended to grant retroactive relief. That is the very gist and essence of the resentencing provisions. We see no coherent reason to suppose that this same intent did not inform the decision to adopt, in Proposition 47, a narrowed test of dangerousness applicable by its terms to Proposition 36 petitions. We find it inconceivable that voters, having twice decided to extend new rights retroactively to current inmates, intended to limit those rights depending upon the procedural happenstance of when a petition was heard in the trial court. (See *Falcon v. State* (Fla.2015) 162 So.3d 954, 962 [noting the "patent unfairness of depriving indistinguishable juvenile offenders of their liberty for the rest of their lives, based solely on when their cases were decided"].)

### 5. Fiscal Effects.

An intent to apply the new test retroactively is also suggested by the *fiscal* purposes of the two measures. The Legislative Analyst estimated that Proposition 47 could realize annual savings "in the low hundreds of millions of dollars" (Ballott Pamp., Gen. Elec. (Nov. 4, 2014) text of Promp. at p. 37), beginning with "the resentencing of

inmates currently in state prison," which "could result in the release of several thousand inmates, temporarily reducing the state prison population" (*id.* at p. 36). Likewise, Proposition 36 was intended to realize savings estimated at up to $90 million per year by shortening future sentences and resentencing current inmates pursuant to section 1170.126. (Ballott Pamp., Gen. Elec. Nov. 6, 2012) text of Prop. 36 at p. 50 [Analysis by Legislative Analyst].) Critically, the Legislative Analyst noted that this number "could be tens of millions of dollars higher or lower depending on several factors," first among them "the number of third strikers resentenced by the court and the rate at which [the Board of Parole Hearings] would have released third strikers in the future under current law." (*Ibid.*) The Legislative Analyst thus recognized—and informed voters—that the rate of denials of Proposition 36 petitions would directly affect the savings actually achieved.

As of 2010, a nonprofit institute estimated the annual cost of imprisonment in California at nearly $50,000. (The Price of Prisons | California Fact Sheet.pdf, <http://www.vera.org/files/price-of-prisons-california-fact-sheet.pdf> (as of Jun. 9, 2016).)[19] This translates into a cost of one million dollars for every 20 inmate-years. Denial of a Proposition 36 petition means—and was understood by voters to mean—that taxpayers would continue to accrue this expense until an inmate died, barring earlier release by the Board of Parole Hearings. To that extent every denial impaired the

---

[19] By 2014, some widely circulated estimates were placing the annual cost of imprisonment at $60,000 or higher per inmate. (See, e.g., Fewer State Prisoners, Higher Cost Per Inmate - California Budget & Policy Center (Aug. 7, 2013) <http://calbudgetcenter.org/blog/fewer-state-prisoners-higher-cost-per-inmate/> (as of Jun. 20, 2016 ["California is expected to spend about $60,000 for each inmate in 2013-14"]; McKinney, et al., In Response: Proposition 47 adds up | SanDiegoUnionTribune.com (Sept. 12, 2014) <http://www.sandiegouniontribune.com/news/2014/sep/12/in-response-proposition-47-adds-up/> (as of Jun. 20, 2016) ["California spends $62,300 to house one inmate annually"].)

fiscal purpose of *both* initiatives, i.e., to save money by reducing the prison population. Given the implied finding in Proposition 47 that the earlier measure had granted courts too much latitude—resulting in the denial of too many petitions—it is entirely rational to suppose that voters intended to relieve themselves of the ongoing costs of those rulings by requiring their reexamination under the new, more restrictive standard.

Here, defendant had apparently served 17 or 18 years of his 25-to-life sentence when he petitioned for resentencing. The denial of his petition meant that he would spend at least another seven years in prison, at a taxpayer cost of some $350,000. If he were not eventually released by the Board of Parole Hearings, he could easily survive another 20 years, representing a cost upwards of $1 million. Given that this imprisonment followed application of a dangerousness test voters had found too broad, it is entirely likely that they meant for him to be released unless he were shown to satisfy the new, more rigorous test. Since nothing approaching such a showing is suggested by this record, there is every reason to believe that voters intended the new test to apply to his and similar cases.[20]

---

[20] Some of the opposition materials alluded to the *cost of rehearing* Reform Act petitions as a reason to vote against Proposition 47. (See CALIFORNIANS AGAINST PROP. 47 | About Proposition 47 (archived Oct. 10, 2014) <https://web.archive.org/web/20141010054701/http://californiansagainst47.com/about-proposition-47/>, (as of Jun. 20, 2016), italics added; see California District Attorneys Association, A Look at Proposition47.pdf <http://www.co.mendocino.ca.us/da/pdf/Proposition47_A_Cruel_Fraud.pdf> (as of Jun. 9, 2016); Proposition 47: A Cruel Fraud <http://docplayer.net/1464582-Proposition-47-a-cruel-fraud.html> (as of Jun. 20, 2016.) At least one uncitable decision has also cited this cost as a reason not to infer an intent by the voters to apply section 1170.18(c) retroactively. It does not require an advanced degree in mathematics to discern that the costs of such proceedings pale by comparison to the hundreds of thousands of dollars that will be borne by taxpayers when a petition is denied. The legislative analyst estimated that resentencing proceedings under Proposition 36 could generate costs of "a few million dollars . . . over a couple of years." (Ballot Pamp., Gen. Elec. (Nov. 6, 2012) text of Proper 36 at p. 50.) Apparently, some 3,000 prisoners were potentially eligible for resentencing; this at any rate is what opponents told voters. (*Id.* at p. 52, quoting Fresno

## 6. Futility of Prospective-Only Application.

Once it is recognized that Proposition 36 petitioners were intended beneficiaries of section 1170.18(c)'s new definition of dangerousness, it becomes apparent that it *must* operate retroactively or it will have virtually no effect. In this light, the considerations cited in the "timing" argument discussed in part I(D), *ante*, operate in favor of applying the new definition to cases in which a Proposition 36 petition has already been denied. The factual premise of that argument are the two-year deadline for Reform Act petitions had all but expired when Proposition 47 took effect. It therefore stands to reason that nearly all eligible inmates would already have filed a Reform Act petition when the new definition took effect. Indeed most, if not nearly all, would already have been ruled upon. This follows not only from the deadline but from simple self-interest. Inmates had no apparent reason to delay and every reason to act quickly. Every day an inmate waited could be a needless day of "base durance." (Henry IV, Part II, act. V, sc. v.) Therefore, insofar as the new definition was intended to apply to Proposition 36 petitions, it must either reach petitions that had already been denied in the trial court, or it was doomed to have virtually no effect.

Akin to the constructional presumption against superfluous language is a presumption that lawmakers do not adopt pointless legislation. (See *Barrett v. Dawson* (1998) 61 Cal.App.4th 1048, 1054 ["We will not presume the Legislature engaged in a futile act"].) If section 1170.18(c) does not apply to this case, and others like it, it will apply to few if any Proposition 36 cases. It follows that voters intended the new

Bee [" 'If Proposition 36 passes, about 3,000 convicted felons serving life terms under Three Strikes could petition for a reduced sentence' "]; see '3 strikes': Proposed law tries to restore intent – SFGate (Nov. 28, 2012) <http://www.sfgate.com/politics/article/3-strikes-Proposed-law-tries-to-restore-intent-2296566.php> (as of Jun. 9, 2016.) This suggests an estimated cost per resentencing hearing in the low four figures. Such an expenditure must be deemed negligible as against an annual expense of at least $50,000 for continued imprisonment.

definition to apply to as many Proposition 36 petitions as possible, which certainly includes any in which an order of denial was not yet final.[21]

### 7. Perversity of Prospective-Only Application.

In answer to the foregoing reasoning it might be suggested that a handful of Proposition 36 petitions remained unfiled or unadjudicated when Proposition 47 took effect, and that section 1170.18(c) was intended to apply only to them. In this view the extension of the new definition to Proposition 36 cases was not wholly futile, but only mostly futile. Accepting the factual proposition that some petitions remained unheard, the posited intent—to benefit only this small class of petitioners—seems irrational to the point of absurdity or even perversity. By this logic, voters intended to extend the newly restrictive definition of dangerousness to those petitioners who waited until near (or beyond) the end of the two-year limitations period, but to withhold it from those prisoners who filed promptly and whose petitions, as a result, had already been denied when Proposition 47 took effect.

Ordinarily the law rewards diligence. (See Civ. Code, § 3527.) The foregoing reading would impute to voters an intention to, in effect, punish those who had acted with alacrity in seeking the relief voters offered them in Proposition 36. That is, the only petitioners likely to glean the benefit of the new enactment would be those—if there were any—who had waited to file their petitions until the time to do so had very nearly expired (or, on a showing of good cause, beyond that time). This would not only seem to

---

[21] This case presents no occasion to express an opinion on what remedies might be available to those whose petitions were denied on dangerousness grounds and as to whom that ruling has become final. It is at least arguable that section 1170.18(c) provides relief in those cases; certainly the opponents expected it to do so. (See CALIFORNIANS AGAINST PROP. 47 | About Proposition 47 (archived Oct. 10, 2014) <https://web.archive.org/web/20141010054701/http://californiansagainst47.com/about-proposition-47/> (as of Jun. 20, 2016); see Proposition47_A_Cruel_Fraud.pdf <http://www.co.mendocino.ca.us/da/pdf/Proposition47_A_Cruel_Fraud.pdf> (as of Jun 20, 2016); Proposition 47: A Cruel Fraud <http://docplayer.net/1464582-Proposition-47-a-cruel-fraud.html> (as of Jun. 20, 2016.) The question is not presented here, however, and we do not address it.

41

discriminate irrationally against the diligent and in favor of the dilatory; it would also fly in the face of the avowed cost-saving purpose of these measures by rewarding those who had, by their delay in seeking relief, diminished the savings taxpayers would realize from a reduction in their sentences.

As we have already noted, in applying a statute courts seek to " 'avoid a construction that would produce absurd consequences, which we presume the Legislature did not intend.' " (*In re Greg F.* (2012) 55 Cal.4th 393, 406; *People v. Mendoza* (2000) 23 Cal.4th 896, 908.)  Applying a more restrictive standard of dangerousness to petitioners who were relatively dilatory in seeking relief, while relegating others to additional years of confinement at public expense even though the same standard might have required their release as well, can readily be characterized as an absurd result which counsels in favor of construing the statute literally to the benefit of defendant and all others similarly situated.

### 8.  Remedial/Ameliorative Purpose.

The leading treatise on statutory construction identifies "three circumstances where retroactive application of a statute may be justified: (1) where legislative intent expressly or impliedly indicates retroactive application is desirable; (2) where the statute is ameliorative or curative in nature; or (3) where fulfillment of the parties' reasonable expectations may require the statute's retroactive application." (2 Sutherland, *supra*, § 41:4, p. 423, fn. omitted.)  We have already concluded that the first circumstance is present.  The same appears true of the second, i.e., that section 1170.18(c)'s modification of the dangerousness standard was adopted to ameliorate, cure, or remedy a perceived defect in the standard adopted in Proposition 36.  The very fact that voters sharply limited the kind of dangerousness that would justify denial of resentencing implies dissatisfaction with the manner in which courts had exercised the broad discretion granted them by the original test as adopted in Proposition 36.  Voters impliedly found that courts had

42

wrongly denied some number of Proposition 36 petitions by too readily finding that the petitioners presented an unreasonable risk of danger.[22]

To be sure, "a remedial purpose does not necessarily indicate an intent to apply the statute retroactively." (*Evangelatos v. Superior Court*, *supra*, 44 Cal.3d at p. 1213.) It will, however, contribute to an inference of such intent consistent with the more general principle that such statutes are "entitled to liberal construction in order to achieve full fruition of their remedial purposes." (2 Sutherland, supra, § 41:11, at p. 506, fn. omitted; see *Hellinger v. Farmers Group, Inc.* (2001) 91 Cal.App.4th 1049, 1061, citing *Kim v. Servosnax, Inc.* (1992) 10 Cal.App.4th 1346, 1356 [statute extending limitations period was curative and "should be liberally construed"].) Provided no intervening rights are impaired, and no contrary intent appears, such provisions should be more freely applied to past events than may be the case with non-remedial statutes. (See *River Garden Retirement Home v. Franchise Tax Bd.* (2010) 186 Cal.App.4th 922, 946, citing *Moran Towing Corp. v. Urbach* (N.Y.App.Div.2003) 1 A.D.3d 722, 768 N.Y.S.2d 33 [cited decision "[o]bserv[ed] that where legislation is curative, retroactivity may be construed liberally"]; *Hall v. Fairchild-Gilmore-Wilton Co.* (1924) 66 Cal.App. 615, 631, citing

---

[22] This case may illustrate the concern reflected in the adoption of section 1170.18(c). The trial court apparently found that defendant posed an unreasonable risk of danger to public safety based on (1) his undoubtedly violent conduct as a young gang member nearly four decades ago; (2) his involvement in violent incidents in prison for which he was not, on this record, shown to be responsible; and (3) evidence of ongoing or recurring issues with substance dependency. Obviously, every third strike prisoner had to incur two or more serious or violent felonies—strikes— to be eligible for a third-strike sentence. It is therefore likely that many if not most Proposition 36 petitioners would have had violent pasts. And while recent aggressive conduct in prison would certainly support an inference of current dangerousness, merely suffering violence at the hands of others—which is consistent with the evidence presented here—would not. Finally, while chemical dependency may warrant concerns about some sort of criminal conduct, many would question whether, by itself it points to an *unreasonable* risk of *danger* to public *safety*.

43

*Baird v. Monroe* (1907) 150 Cal. 560 [presumption against retroactivity not applicable to curative statutes].)

We conclude that section 1170.18(c) is applicable to defendant's case and that remand is necessary to permit reconsideration of his petition in light of the definition of dangerousness set forth there.

## II.  *Equal Protection.*

Defendant contends that the scheme enacted by Proposition 36 violates the Equal Protection Clauses of the State and Federal Constitutions because it reduces the punishment for yet-to-be-sentenced defendants regardless of dangerousness, while extending relief to current inmates only if their resentencing is not found to pose an unreasonable risk of danger.  According to defendant, equal protection requires the application of the same standard for defendants seeking resentencing and defendants currently being sentenced.

Equal protection issues arise when it appears that a statute treats *similarly situated* people differently.  If this occurs, and the disparate treatment "creates a suspect classification or impinges on the exercise of a fundamental right," it is subject to strict scrutiny, meaning that it will be upheld "only if it is necessary to further a compelling state interest."  (*People v. Silva* (1994) 27 Cal.App.4th 1160, 1167.)  In other cases, the disparity "will satisfy constitutional requirements if it bears a rational relationship to a legitimate state purpose."  (*Ibid.*)

The first question posed by an equal protection claim is whether the defendant has been subjected to disparate treatment vis à vis another class of persons that is " 'similarly situated for purposes of the law challenged.' "  (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253, quoting *People v. Gibson* (1988) 204 Cal.App.3d 1425, 1438, 252 Cal.Rptr. 56.)  Defendant notes that new third-strike offenders and persons currently

44

serving third-strike sentences share a common criminal history: "Members of both groups have at least two prior convictions for serious or violent felonies as well as a current non-serious, nonviolent offense that would have previously subjected them to a Three Strike sentence of 25 years to life." This makes them "similarly situated" for purposes of the Reform Act, he contends, because the goals of that act were "to 'restore the Three Strikes law to the public's original understanding by requiring life sentences only when a defendant's current conviction is for a violent or serious crime' and to 'save hundreds of millions of taxpayer dollars every year' by ensuring that the state does not continue to indefinitely house people serving life sentences for 'minor crimes.' " (Quoting Ballott Pamp., Gen. Elec. (Nov. 6, 2012) Findings and Declarations, Proposition 36, § 1; at p. 105.) These goals, he asserts, were the same with respect to both past and future offenders.

This oversimplifies the rationale of the Reform Act as well as that of the Three Strikes law it was intended to reform. The basic premise of the Three Strikes Act was that any person who committed a third felony after being convicted or two or more strike felonies deserved a life sentence. The Reform Act reflects the judgment that a two-strike history coupled with a non-violent current offense does not necessarily reflect either enough culpability or enough dangerousness to justify a life sentence, particularly given the fiscal burdens such a sentence imposes upon the state and its taxpayers. The Reform Act reflects a balancing of these three factors—culpability, dangerousness, and cost—in a manner calculated to suitably punish the defendant and adequately protect society while easing the financial burdens flowing from the earlier, more vindictive approach.

We may assume that current third-strike inmates and new third-strike offenders are chargeable with the same level of culpability. However we do not believe they are similarly situated with respect to the other two factors. Perhaps the least of the differences—though still very real—is the cost savings to be realized from applying the

45

Reform Act to current inmates, as compared to the savings that can be realized with new offenders. Defendant, as previously noted, has already served much of his sentence. He will become eligible for parole in a few years. Most of the costs of his sentence are, in all probability, water under the bridge. Were a new offender being currently sentenced on an identical record, however, the reduction in his sentence—and resulting savings— would be dramatic: the potential sentence would be reduced from a 25 year minimum to a 12 year maximum.[23] Under the figures previously mentioned, the resulting costs would be reduced from (at least) $1,250,000 to (at most) $600,000. (See pt. I(F)(5), *ante*.)

More significant, however, are the differences between the two groups in the state's ability to address perceived dangerousness on the part of the offender. An appreciation of this point must begin with a review of the role of dangerousness, as perceived by the prosecutor and sentencing judge, in determining the punishment to be visited upon a criminal defendant. In commencing a prosecution the prosecutor exercises the prerogative of deciding what to charge and how to charge it. This power is exercised, presumably, in light of two primary factors: perceived culpability and dangerousness. The same considerations inform any decision the prosecutor may make with respect to a proffered guilty plea to less than all of the charges brought. When the matter comes up for sentencing, the power shifts to the trial court to make discretionary decisions affecting the extent of the defendant's punishment, perhaps most notably the choice of a base term (lower, middle, or upper) and whether to impose consecutive or concurrent sentences. Again these decisions are likely to be infused with judgments about both culpability and dangerousness.

---

[23] The 12 years would consist of double the three-year maximum base term, plus the six one-year priors which the sentencing court stayed, although they should instead have been stricken. (See *People v. Langston* (2004) 33 Cal.4th 1237, 1241.)

It follows that whenever a sentence is retroactively reduced by blanket legislation such as the Reform Act, one result may be to nullify at least some prosecutorial and judicial decisions that were intended, at least in part, to protect the public from a particular defendant's perceived dangerousness. To the extent the perceptions of dangerousness were sound—and remain sound when the sentence is reduced—the nullification of those actions may expose the public to an unreasonable risk of danger. It is these risks which drafters sought to avert by empowering the trial court to deny resentencing under the Reform Act upon a finding that the defendant in fact presents an unreasonable risk of danger to the public.

This circumstance distinguishes current inmates from new offenders. In the case of the latter, the prosecutor, followed by the sentencing court, will often still have the power to shape a punishment deemed sufficient to address any perceived dangerousness. The Reform Act merely eliminates one tool they possessed under prior law—the power to impose a 25-to-life sentence for a non-strike felony.[24] The prosecutor may still seek conviction of additional or more serious charges or enhancements, and the court can still make sentencing choices, designed to protect the public from the defendant's perceived dangerousness for relatively longer periods. This is a protection that the public does not have under a categorical, across-the-board reduction in sentences already imposed.

A similar point is hinted at, though not in the immediate context of an equal protection claim, in *People v. Yearwood* (2013) 213 Cal.App.4th 161 (*Yearwood*). The defendant there had been sentenced about a year before the adoption of the Reform Act,

---

[24] This of course assumes that the facts would not sustain a charge asserting a qualifying strike. It is entirely possible that under the prior regime, a prosecutor might forego efforts to convict a third-striker of a serious or violent felony—perhaps as part of a plea arrangement—because some lesser offense could still yield a 25-to-life sentence. Should such a case arise in the wake of the Reform Act, the prosecutor may avoid the effects of that act by seeking and obtaining a conviction of the serious or violent felony.

but the conviction was not final when that act took effect.  He contended that he was entitled to be sentenced as a new offender under the act, without being required to invoke the resentencing provisions.  In rejecting this contention as a matter of statutory construction, the court wrote, "Giving amended [Penal Code] sections 667 and 1170.12 prospective-only application supports the Act's public safety purpose by reducing the likelihood that prisoners who are currently dangerous will be released from prison due to the Act.  During the pretrial, trial and sentencing phases of the criminal justice system, *various discretionary decisions are available to the prosecutor and the trial court that can result in a shorter or longer term* of imprisonment (e.g., selection of the appropriate base term, concurrent/consecutive sentencing, dismissal of a strike in the interests of justice).  Once the defendant is sentenced, prosecutorial and judicial discretion are effectively exhausted." (*Yearwood*, *supra*, at p. 176, italics added.)  In other words, to treat the defendant as a new offender *after* he had been sentenced under prior law would deprive the prosecutor and court of the powers they would otherwise have to craft an outcome reflecting their sense of the defendant's dangerousness.  The same is true of current inmates who invoke the resentencing provisions of the Reform Act.  This places them in a materially different position than new offenders, and warrants a treatment of their cases that takes the question of dangerousness into account.

We conclude that defendant has not demonstrated the threshold requirement for an equal protection challenge, i.e., that he be situated similarly to the newly charged defendants to whom he compares himself.

## III.    *Jury Trial*

Defendant contends that the prosecution was required to prove dangerousness to a jury beyond a reasonable doubt under the authority of *Apprendi v.  New Jersey* (2000) 530 U.S. 466, 490 (*Apprendi*), which held that the federal constitutional rights to a jury

48

and to proof beyond a reasonable doubt (U. S. Const. 6th & 14th Amends., § 1) extend to the trial of "any fact that increases the penalty for a crime beyond the prescribed statutory maximum." (See *People v. Towne* (2008) 44 Cal.4th 63, 77 [referring to requirement that "a fact exposing a defendant to a higher sentence be proved to a jury beyond a reasonable doubt"].) Defendant contends that since he is eligible for resentencing under the Reform Act, the "prescribed statutory maximum" for his offense is now the second-strike sentence of double the base term that would be imposed if resentencing were granted. An unreasonable risk of danger thus constitutes, he contends, a fact "increas[ing] the penalty" to a 25-to-life term. Accordingly, he concludes, that fact must be tried by a jury and found, if at all, beyond a reasonable doubt.

This court has already held that the rule of *Apprendi* does not apply to a determination of dangerousness under a Reform Act petition. (*Esparza*, *supra*, 242 Cal.App.4th at pages 737-740.) Defendant fails to persuade us that we should reconsider that holding. In *Apprendi* the question was whether a finding of racially biased motivation, the effect of which was to double the maximum sentence to which the defendant was exposed, could be properly made by a judge rather than a jury. The state argued that it was not an element of the offense but a "sentencing factor" which, under Supreme Court precedent, need not be found by a jury. (*Apprendi*, *supra*, 530 U.S. at p. 492; see *McMillan v. Pennsylvania* (1986) 477 U.S. 79, 86, 90 (*McMillan*).) The Supreme Court had signaled its rejection of this distinction in a federal prosecution where it held that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." (*Jones v. United States* (1999) 526 U. S. 227, 243, fn. 6.) In *Apprendi* it reaffirmed this rule, insofar as it involved jury trial and reasonable doubt, and applied it to a prosecution under state law. (*Apprendi*, *supra*, at

49

pp. 490, 497.) Subsequently the court extended the rule to facts that increase the *minimum* sentence to which a defendant is exposed. (*Alleyne v. United States* (2013) ___ U.S. ___ [133 S. Ct. 2151, 2155], overruling *Harris v. United States* (2002) 536 U.S. 545.)

At its core *Apprendi* is concerned with the trial of facts that are constitutionally indistinguishable from *elements of the crime*. (See *Apprendi*, *supra*, 530 U.S. at p. 494 [referring to "the constitutionally novel and elusive distinction between 'elements' and 'sentencing factors' "]; *id.* at p. 478, fn. omitted [noting that distinction was "unknown to the practice of criminal indictment, trial by jury, and judgment by court as it existed during the years surrounding our Nation's founding"].) It seeks to shield, against encroachment by the state, the fundamental right not to be subjected to criminal punishment unless the state has convinced a jury that the facts prescribed by law as grounds for punishment are true beyond a reasonable doubt. *Apprendi* bars the state from bypassing this shield simply by declaring such a fact to be a "sentencing factor" to be found by a judge.

We see no conceptual basis on which to apply this doctrine to the resentencing procedure created by the Reform Act. Here the state, through an act of lenity, has elected to *reduce* a penalty duly imposed under prior law. The fact that the reduction is made to depend on the presence or absence of certain conditions does not make those conditions equivalent to elements of the offense. Defendant has already been convicted of the underlying offense; all facts necessary to the imposition of his present sentence were duly found by a jury. The question now is whether the punishment to which that verdict subjected him should be *reduced*. The existence of a condition precluding its reduction is not a fact necessary to increase his punishment for purposes of *Apprendi*. For purposes of *Apprendi*, the punishment to which that verdict exposed him was imprisonment for 25

50

years to life. A finding that he is too dangerous to permit such a reduction does not increase that punishment.

This conclusion is entirely consistent with the origins and core purpose of the jury trial guarantee, as summarized in *Apprendi*, *supra*, 530 U.S. at page 477: "[T]he historical foundation for our recognition of these principles extends down centuries into the common law. '[T]o guard against a spirit of oppression and tyranny on the part of rulers,' and 'as the great bulwark of [our] civil and political liberties,' 2 J. Story, Commentaries on the Constitution of the United States 540-541 (4th ed. 1873), trial by jury has been understood to require that '*the truth of every accusation*, whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of [the defendant's] equals and neighbours . . . .' 4 W. Blackstone, Commentaries on the Laws of England 343 (1769) (hereinafter Blackstone) (emphasis added)." Here no "accusation" is any longer at issue. The only relevant accusation preferred against defendant had already been duly sustained by a jury long before the present matter arose. The question is not whether some additional accusation is true, but whether facts exist that bar him from the benefits conferred by the Reform Act.

Nor can we conceive of a way in which a procedure such as that under scrutiny here could be used as a tool of tyranny or oppression. In *McMillan*, *supra*, 477 U.S. at page 88, the court alluded to the possibility of a statute crafted so that the "tail" of a judge-found sentencing fact "wags the dog of the substantive offense." It is easy to see the vice in such a regime, which would take power away from the body to whom it is constitutionally entrusted, and place it in the hands of an agent, or at least affiliate, of the state, from whom the Sixth Amendment was designed to withhold it. We see no way in which a retroactive lessening of punishment, whether conditional or not, could ever achieve a similar effect, wittingly or otherwise.

51

The question here may also be analogized to one of the points considered in *People v. Gutierrez* (2014) 58 Cal.4th 1354, where the court considered the viability of California's regime for sentencing juveniles to life without possibility of parole (LWOP) in the wake of *Miller v. Alabama* (2012) 567 U.S. ___ [183 L.Ed.2d 407, 132 S.Ct. 2455] (*Miller*). *Miller* held that when imposed for an offense committed below the age of 18, a mandatory LWOP sentence constitutes cruel and unusual punishment. In *Gutierrez* the state argued, among other things that an LWOP imposed for a juvenile offense under California law did not offend the *Miller* rule because California law entitles such an offender to petition for resentencing at intervals commencing after 15 years' imprisonment. In view of this provision, argued the Attorney General, "the initial sentence 'is thus no longer effectively a sentence of life without the possibility of parole.' " (*People v. Guiterrez, supra,* at p. 1386.) The Supreme Court emphatically rejected this characterization: "A sentence of life without parole under [Penal Code] section 190.5(b) remains *fully effective* after the enactment of [Penal Code] section 1170(d)(2). That is why [Penal Code] section 1170(d)(2) sets forth a scheme for *recalling* the sentence and *resentencing* the defendant. As the Attorney General notes, [Penal Code] section 1170(d)(2) provides juvenile offenders convicted of special circumstance murder with 'three opportunities to have their sentences of life without the possibility of parole *changed* to a sentence of 25 years to life.' (Italics added.)" (*Ibid.*)

The same is true here. Defendant's 25-to-life sentence was and is fully effective unless and until his sentence is recalled and a new sentence is imposed. Only after the sentence is recalled can it be said that a new statutory maximum comes into play. But the sentence cannot be recalled if the court finds that doing so would pose an unreasonable risk of danger to public safety. That condition does not increase defendant's sentence; if present, it operates only to preserve intact the sentence that was originally imposed on him in full compliance with his right to jury trial.

52

Accordingly, we reaffirm the conclusion in *Esparza* that defendant was not entitled to a jury finding of dangerousness beyond a reasonable doubt.

## IV.     *Presumption in Favor of Resentencing; Burden of Persuasion.*

Defendant contends that section 1170.126 creates a "strong presumption" in favor of resentencing. The supporting argument is long on abstractions and short on concrete application to this case. He does not suggest how such a presumption, if found to exist, would contribute to a finding of error in this case. He simply asserts that there was a presumption in favor of resentencing, to which—implicitly—the trial court failed to accord proper weight.

This court has previously rejected the contention that section 1170.126 creates a presumption in favor of resentencing. (*Esparza, supra,* 242 Cal.App.4th 726, 793; accord, *Kaulick, supra,* 215 Cal.App.4th 1279, 1301-1302.) Again defendant offers no compelling reason to depart from that holding. He asserts that the legal context is similar to that which led the Supreme Court to declare that trial courts had only "limited" discretion to strike prior strikes so as to avoid imposing a third-strike sentence. (*People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 530 (*Romero*).) In a later decision the court quoted with approval a Court of Appeal's statement that such relief was warranted only when " 'the sentencing court "conclud[es] that an exception to the [three strikes] scheme should be made because, for articulable reasons which can withstand scrutiny for abuse, this defendant should be treated as though he actually fell outside the Three Strikes scheme." ' " (*People v. Carmony* (2004) 33 Cal.4th 367, 377 (*Carmony*), quoting *People v. Strong* (2001) 87 Cal.App.4th 328, 337-338.)[25] Defendant suggests somewhat

_____

[25] Defendant's appellate counsel betrays an unfortunate tendency to attribute statements, and even quotations, that do not appear in the cited sources. He quotes *Carmony*, *supra*, 33 Cal.4th at page 378 as characterizing relief under *Romero* as an "extraordinary act," but that phrase appears nowhere in that opinion. Elsewhere he describes Proposition 36's findings and declarations as "stat[ing]" that the measure

obliquely that this amounted to a presumption *against* striking priors—i.e., in favor of the punishment prescribed by the Three Strikes Law—and that section 1170.126(f) in effect "reversed" the presumption, so that a finding of dangerousness is disfavored, and resentencing is favored.

The first problem with this analysis is that we know of no decision which characterized the regime under *Romero* as a "presumption." In *Romero* itself the court used that term only in referring to a quite different proposition, i.e., that the Legislature intends to enact constitutionally valid statutes. (*Romero*, *supra*, 13 Cal.4th at pp. 509; see *id.* at p. 518.) In *Carmony* the court referred to (1) an inferred presumption by the Legislature that a court acts properly in sentencing a defendant in accordance with the Three Strikes Law (*Carmony*, *supra*, 33 Cal.4th at p. 376); (2) a presumption that, unless shown to have acted irrationally or arbitrarily, the sentencing court has " ' 'acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review" ' " (*id.* at pp. 377, quoting *People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977-97); (3) a "strong presumption" that any sentence conforming to the Three Strikes Law is "both rational and proper" (*id.* at p. 378); (4) " 'the presumption that a trial court ordinarily is presumed [*sic*] to have correctly applied the law' " (*id.* at p. 378, quoting *People v. Gillispie* (1997) 60 Cal.App.4th 429, 434). Of these only the third resembles the presumption advocated by defendant, and it differs in at least one critical respect: it is an *appellate* presumption in

<hr />

"represents the electorate's judgment that second-strike doubling of a sentence provides sufficient punishment for offenders whose current offenses are nonviolent." The nearest thing to such a statement in the findings is that the measure would "[r]estore the Three Strikes law to the public's original understanding by requiring life sentences only when a defendant's current conviction is for a violent or serious crime." (Ballot Pamp. Gen Elec. (Nov. 6, 2012) Three Strikes Reform Act of 2012, § 1, subd. (2) at p. 105.) Describing that which may be inferred as having been "stated" is not proper—or effective—advocacy.

*favor* of the trial court's ruling when that ruling *conforms* to a statutory default.  Here a comparable presumption would favor a decision by the trial court to *grant* a Reform Act petition over the objection that doing so would pose an unreasonable risk of danger to the public.  Such a presumption might well be said to exist, but it does not assist defendant because the trial court here ruled against him

Defendant also suggests that a presumption in favor of resentencing and against a finding of disqualifying dangerousness arises from the wording of the Reform Act, i.e., that a petitioning defendant, if eligible for recall of sentence, "*shall* be resentenced . . . *unless* the court, in its discretion, determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety."  (§ 1170.126(f), italics added.)  He asserts that "[u]nder longstanding statutory construction principles, the 'shall/unless' formulation establishes a strong presumption."  But defendant offers no authority for this assertion, and we have found none.  Instead he discusses United States Supreme Court cases concerning the extent to which parole decisions under state law must satisfy federal due process guarantees.  These cases may be characterized as holding that the statutory language considered in them gave rise to a "presumption" of liberty sufficient to raise due process protections.  (E.g., *Board of Pardons v. Allen* (1987) 482 U.S. 369, 377-378 (*Allen*); *Greenholtz v. Inmates of Neb. Penal and Correctional Complex* (1979) 442 U.S. 1, 11-12 (*Greenholtz*).)  The Montana statute at issue in *Allen*, *supra*, 482 U.S. at pages 376-377, did not employ a "shall/unless" structure but rather required that parole be granted "when" the parole board made certain findings.  The Supreme Court nonetheless found that the statute " 'creat[ed] a presumption that parole release will be granted' when the designated findings are made." (*Allen, supra*, at pp. 377-378.)  The court declared that the same was true of the Nebraska statute it had earlier considered in *Greenholtz*, *supra*, 442 U.S. at page 11, which did employ a "shall/unless" construction.

55

However we are not persuaded that the "presumptions" found in those cases have any bearing on this matter.  They are not concerned with the principles governing the trial court's determination of any issue, or those governing appellate review of such an issue.  Rather they consider whether the state parole laws at issue gave rise to such a "legitimate expectation of release" (*Greenholtz*, *supra*, 442 U.S. at p. 12) as to generate a "liberty interest" protected by the due process clause.  (*Allen*, *supra*, 482 U.S. at p. 370).  Apart from the shared use of the term "presumption," we fail to see any connection between those cases and the matters at issue here.

This is not to suggest that the "shall/unless" construction is meaningless.  The "unless" clause clearly constitutes an exception or proviso, and as such should be narrowly construed under general principles of statutory construction.  (See *Carter v. Cohen* (2010) 188 Cal.App.4th 1038, 1051, quoting *Hayter Trucking, Inc. v. Shell Western E & P, Inc.* (1993) 18 Cal.App.4th 1, 20 [" 'Exceptions to the general rule of a statute are to be strictly construed and, in interpreting exceptions to the general statute, courts include only those circumstances which are within the words and reason of the exception.' "].)  However defendant has not couched any argument in terms of the construction of the proviso, and we do not readily see how such an argument might be made.

A more pertinent principle may be that "the party seeking to rely on an exception to a general rule has the *burden of proving* the exception." (*Standard Pacific Corp. v. Superior Court* (2009) 176 Cal.App.4th 828, 834, italics added; see *Simpson Strong-Tie Company, Inc. v. Gore* (2010) 49 Cal.4th 12, 25, fn. omitted [referring to the "long-standing rule of construction that the party seeking to benefit from an exception to a general statute bears the burden to establish the exception"]; *ibid*., quoting *City of Lafayette v. East Bay Mun. Utility Dist.* (1993) 16 Cal.App.4th 1005, 1017 [" 'One seeking to be excluded from the sweep of the general statute must establish that the

exception applies.' "].)  Here this unquestionably meant that the prosecution bore the evidentiary burden of proving that resentencing defendant would pose an unreasonable risk of danger.  (Accord, *Esparza*, *supra*, 242 Cal.App.4th at pp. 742-743; *Kaulick*, *supra*, 215 Cal.App.4th at pp. 1301-1302.)

The record is somewhat ambiguous with respect to trial court's allocation of the burden of persuasion.  At the outset of the hearing the court said to the prosecutor, "Mr. Carr, it is your burden, please begin."  This would seem to reflect recognition that it was the prosecutor's burden to establish that resentencing would pose an unreasonable risk of danger to the public.  However, at the conclusion of the hearing the court expressed its finding in negative terms, stating that it found "nothing right up until the most recent triggering offense to *suggest to this Court that the petitioner presents anything but a substantial risk* to public safety if he should be resentenced and released and for those reasons I'm going to deny the petition."  (Italics added.)  The court's very reluctance to state as a positive fact that defendant actually posed such a risk casts some doubt on the assiduousness with which it applied the burden of proof it had earlier seemed to acknowledge.  We need not attempt to parse the court's remarks further, however, for we are remanding the matter for further proceedings, in which the burden will rest squarely upon the prosecution to establish as a fact that resentencing would pose an unreasonable risk of danger to the public.

This conclusion—that respondent bears the burden of persuasion on the issue of dangerousness—has the same practical effect as declaring that the statute creates a rebuttable *evidentiary* presumption affecting the burden of proof.  (See Evid. Code, §§ 605, 115.)  And we may also agree that the statute gives rise to a strong appellate presumption in favor of a ruling *granting* a Reform Act petition.  Beyond that, however, we are not convinced that the statute gives rise to a presumption in any relevant or useful sense.

57

## V. *Applicability of Rules of Evidence*

Finally, defendant charges the trial court with error in admitting hearsay evidence, including his prison disciplinary records and police reports implicating him, via compound hearsay, in the 1981 and 1983 murders and the 1983 arson. He contends that the rules of evidence applicable to trial also apply to hearings held pursuant to section 1170.126(f) to determine whether a petitioner poses an unreasonable risk of danger to public safety. His argument on this point is, again, less than explicit. First he makes a cursory allusion to Evidence Code section 300, which states, "Except as otherwise provided by statute, this code applies in every action before the Supreme Court or a court of appeal or superior court, including proceedings in such actions conducted by a referee, court commissioner, or similar officer, but does not apply in grand jury proceedings."[26] (Evid. Code, § 300 (§ 300); see *id*., § 105 [" 'Action' includes a civil action and a criminal action."].)

On its face this statute would seem to indicate that the codified rules of evidence apply in every criminal proceeding to which a statute does not expressly declare them inapplicable. However, a large body of caselaw has developed which may be very broadly characterized as countenancing the admission of objectionable evidence—i.e., evidence that would be excluded in an ordinary action if properly objected to—in post-conviction proceedings such as sentencing and revocation of probation or parole, unless the evidence is so unreliable, or its admission is otherwise so unfair, as to infringe upon the defendant's due process rights. (E.g., *People v. O'Connell* (2003) 107 Cal.App.4th 1062, 1066 [" 'As long as hearsay testimony bears a substantial degree of trustworthiness

---

[26] Defendant states, "[T]he question of whether a petitioner poses an unreasonable risk to public safety is an inquiry to be conducted separately from a determination of what the appropriate sentence should be if he is granted relief. [Citation.] Therefore, the rules of evidence must apply to the risk assessment hearing. (Evid. Code Section 300.)"

it may legitimately be used at a probation revocation proceeding.' "].)  So far as we can see, none of these cases have considered the effect of section 300.  Instead they apply *constitutional* principles largely developed by the United States Supreme Court.  (See, e.g., *People v. Abrams* (2007) 158 Cal.App.4th 396, 400, quoting *Morrissey v. Brewer* (1972) 408 U.S. 471, 489 ["the parole revocation 'process should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial' "]; *People v. Lamb* (1999) 76 Cal.App.4th 664, 682-683, citing inter alia *Williams v. New York* (1949) 337 U.S. 241, 251, and *Williams v. Oklahoma* (1959) 358 U.S. 576, 584 ["a sentencing court may consider a broad range of information in deciding whether to grant probation in a particular case. . . .  Due process does not require that a criminal defendant be afforded the same evidentiary protections at sentencing proceedings as exist at trial. . . .  A sentencing judge may consider responsible unsworn or out-of-court statements concerning the convicted person's life and characteristics."]; *People v. Winson* (1981) 29 Cal.3d 711, 713-714 [in light of federal and state authorities concerning due process rights at parole or probation revocation hearing, preliminary hearing transcript was improperly admitted without a showing of good cause]; *People v. Maki* (1985) 39 Cal.3d 707, 713-714, 716-717 [car rental and hotel receipts were objectionable hearsay, but reliance on them to prove probationer's absence from state did not offend due process].)[27]

---

[27] A number of cases have cited *People v. Arbuckle* (1978) 22 Cal.3d 749, for the proposition that relaxed evidentiary standards govern post-conviction proceedings.  That case was solely concerned, however, with the defendant's right to due process and, more specifically, to confront adverse witnesses—specifically the authors of statements in a diagnostic report prepared pursuant to Penal Code section 1203.03.  In addressing a statutory argument somewhat similar to the argument that could be made under section 300, the court noted that section 1203.03 itself brought the report within an exception to the hearsay rule.  (*Id.* at p. 754, fn. 2.)  The case therefore does not support the proposition that the Evidence Code is inapplicable to post-conviction proceedings.

Of course, constitutional limitations on the admission of evidence are a floor, not a ceiling. If greater restrictions are imposed by statute, then those restrictions will necessarily govern in the absence of some distinct ground not to give effect to the statute. (See *People v. Holmes* (1993) 12 Cal.App.4th 1094, 1097, italics added ["The rules governing admission and use of evidence are contained principally in the Evidence Code, and the statutes therein govern all criminal proceedings unless *overridden* by constitutional concerns o[r] specific provisions of the Penal Code."].) Yet so far as we can tell, the potential effect of section 300—and through it, the rest of the Evidence Code—has gone wholly unremarked in these cases.

We find, however, that the issue is not ripe for review. We see no indication that defendant ever objected to evidence below on the ground that it violated rules codified in the Evidence Code. Defendant did object to evidence below, but only on the ground that it did not meet the *constitutional* standards previously alluded to. Thus he asserted that specified portions of the prosecutor's recitation of his history, "and all supporting exhibits," constituted "*unreliable* hearsay"—a formula pregnant with the concession that reliable hearsay would be admissible. (Capitalization altered and italics added.) He compared the challenged evidence to evidence that had been held sufficiently reliable— or not—to be considered in sentencing-related proceedings. He quoted the statement in *People v. Eckley* (2004) 123 Cal.App.4th 1072, 1080, that " 'a court's reliance, in its sentencing and probation decisions, on factually erroneous sentencing reports or other incorrect or unreliable information can constitute a denial of due process.' " He asserted that the challenged materials "lack the reliability required for use at a sentencing hearing," and that reliance on them "would be fundamentally unfair" so as to infringe his "due process right . . . to insist that only reliable evidence be used in determining whether or not he should be resentenced."

60

To preserve objections predicated on the Evidence Code, defendant had to *make* objections predicated on the Evidence Code. (See Evid. Code, § 353, subd. (a).) We are particularly inclined to enforce this requirement where the objection is of such a character that its timely assertion might have permitted the proponent of the evidence to cure the defect. Here the court was presented with voluminous documentary evidence including police and probation reports, prison records, and transcripts of testimony. The absence of specific objections prevented the prosecution from attempting to cure any objections the court might otherwise have been inclined to sustain.

A similar difficulty attends defendant's constitutional objections. He objected blow to specific sections of the prosecutor's brief "and all supporting exhibits." Nor does his brief on appeal target specific items of evidence, stating only that "hearsay like Mr. Cordova's prison disciplinary records and prior police investigative reports—linking him to a murder, arson, and rape but resulting in no convictions—should not have been admitted." But some prison records, and even police reports, may have been admissible over a hearsay objection—at least in part—as business or official records. (See Evid. Code, §§ 1270-1272, 1280-1284.)

We recognize that the task of winnowing objectionable from non-objectionable evidence is a daunting one when, as here, the state presents several large volumes of documentary evidence with nothing resembling an adequate index or other means of navigation.[28] The quality of the copies is, for the most part, so poor that the text cannot

---

[28] The difficulty is illustrated by defendant's objection below to section "II.A." of the prosecutor's opposition memorandum "and all supporting exhibits." The cited section recounts defendant's supposed juvenile history, for which the prosecutor cited "Report of Adult Probation Officer, Docket #56487 dated October 18, 1973 (Exhibit 6)." Perhaps there was a conspicuous exhibit tab labeled "6" in the trial court record, but on appeal the only way to find this document is to thumb through the transcript looking for an otherwise blank page bearing that legend.

be digitized and therefore cannot be searched.[29] The sheer volume and lack of coherent organization of such a presentation may itself raise questions of fundamental fairness. Trial by avalanche is bad enough in civil cases between well-heeled litigants. In a criminal case between busy publicly-funded counsel it raises at least a whiff of denial of due process.[30] The trial court would act well within its powers in requiring the prosecutor to provide a thematic or other index making it possible to frame evidentiary issues in a manageable fashion. At a minimum, the materials should be consecutively page-numbered so that citations to specific documents do not require paging through whole transcripts searching for exhibit numbers, or worse, titles and dates.

---

[29] This characteristic is exacerbated by the clerk's apparent practice of reducing copies of file materials by something like 33 percent in copying them for the appellate transcript. The rules of court require the transcript to contain specified documents, not miniatures of those documents.

[30] An illustration of the kind of difficulty that arises from such a showing is provided by the prosecutor's account of a "rape" supposedly occurring on January 1, 1973, when defendant was 18. According to the prosecutor's memorandum, defendant and another youth "grabbed" the 15-year old victim as she was passing a hotel and "forced" her into a room where the rape occurred. This was indeed the victim's initial account, but after it was compromised by further investigation she acknowledged accompanying the youths to the room voluntarily. Defendant, the second youth, and a third youth who was apparently not charged all claimed that she had also voluntarily consented to intercourse. She continued to deny this, but defendant was booked and charged only for intercourse with a minor. The disposition of that charge is not reflected in the record. But nothing before the trial court reliably established a forcible rape.

At least two of the items in the prosecutor's criminal history of defendant rested entirely on cryptic entries in a document cited by the prosecutor as a "Manual Criminal History." The entries, identical save for arrest and disposition dates about a week apart, state only " 'Arrested in prison' 4573.6 PC / . . . . DA/CA rej, int.just.," which the prosecutor translates as " 'Arrested in Prison' for a violation of Penal Code §4573.6 (Possession of a Controlled Substance). Case was rejected – Interest of Justice."

At least one entry in the history, asserting a parole violation consisting of access to ammunition and positive tests for controlled substances, is supported by no citations to evidence at all.

In any event, our remand will provide ample opportunity to bring evidentiary issues into focus, as they are not in the present appeal. Defendant will be free to assert any ground of objection, but should target challenged items as precisely as the record permits, stating grounds specifically, if he hopes to preserve the issue for further appellate review.

## DISPOSITION

The order denying the petition for resentencing is reversed for further proceedings in accordance with this opinion.

## APPENDIX
### PUBLIC DEBATE ON PROPOSITION 47:
### SOME WEB SOURCES AVAILABLE AS OF JUNE 2016

1.      Facts – No on Prop 47
<http://www.votenoprop47.org/No_On_Prop_47__Facts.html> (as of Jun. 20, 2016); see Facts - No on Prop 47 (archived Sept. 28, 2014) <https://web.archive.org/web/20140928005627/http://votenoprop47.org/No_On_Prop_47__Facts.html> (as of Jun. 20, 2016) [same page].

2.      California District Attorneys Association, CDAA Looks at Proposition 47 (Aug. 29, 2014), apparent copies available at Proposition47_A_Cruel_Fraud.pdf <http://www.co.mendocino.ca.us/da/pdf/Proposition47_A_Cruel_Fraud.pdf> (as of Jun. 20, 2016), and Proposition 47:  A Cruel Fraud <http://docplayer.net/1464582-Proposition-47-a-cruel-fraud.html> (as of Jun. 20, 2016).

3.      Chief Zimmerman takes on retired Chief Lansdowne over Prop. 47 | SanDiegoUnionTribune.com (Sept. 7, 2014) <http://www.sandiegouniontribune.com/news/2014/sep/07/prop-47-zimmerman-lansdowne-drugs-misdemeanor/> (as of Jun. 20, 2016).

4.      Supervisors vote 3-2 to oppose state measure that would reduce some felonies - San Jose Mercury News (Sept. 9, 2014) <http://www.mercurynews.com/news/ci_26503073/supervisors-vote-32-to-oppose-state-measure-that-would-reduce-some-felonies> (as of Apr. 19, 2016).

5.      CSAC (Sept. 12, 2014) <https://web.archive.org/web/20141014082622/http://bulletin.counties.org/sec.aspx?id=CD3D1A93C6CD49AFBDB4FB89F1AB01EF> (as of Jun. 20, 2016) [county association endorsing "no" vote].

6.      NADCP Opposes CA's Prop 47 | NADCP (No date) <http://www.nadcp.org/prop47opposition> (as of Jun. 20, 2016) [statement of opposition by drug professionals' organization];

7.      Gingrich, et al., What California can learn from the red states on crime and punishment - LA Times (Sept. 16, 2014) <http://www.latimes.com/opinion/op-ed/la-oe-0917-gingrich-prop--47-criminal-justice-20140917-story.html> (as of Jun. 20, 2016).

8.      Zimmerman, et al., Prop 47 is dangerous and poorly drafted | SanDiegoUnionTribune.com (Sept. 20, 2014)

<http://www.sandiegouniontribune.com/news/2014/sep/20/prop-47-passage-would-have-dangerous-consequences/> (as of Jun. 20, 2016).

9.      Lansdowne, Locking up nonviolent offenders is costly and ineffective | SanDiegoUnionTribune.com (Sept. 20, 2014) <http://www.sandiegouniontribune.com/news/2014/sep/20/yes-on-prop-47-to-stop-the-cycles-of-crime/> (as of Jun. 20, 2016).

10.      Chronicle recommends: Yes on Proposition 47—SFGate (Sept. 22, 2014) <https://web.archive.org/web/20141026132101/http://www.sfgate.com/opinion/editorials/article/Chronicle-recommends-Yes-on-Proposition-47-5768086.php> (as of Jun. 20, 2016).

11.      Mercury News editorial: Prop. 47 will help California break cycle of crime - San Jose Mercury News (Sept. 25, 2014) <http://www.mercurynews.com/opinion/ci_26604547/mercury-news-editorial-prop-47-will-help-california?source=pkg> (as of Jun. 20, 2016).

12.      Endorsement: Proposition 47 goes too far, too soon after other major criminal justice system changes | The Sacramento Bee (Sept. 28, 2014) <http://www.sacbee.com/opinion/election-endorsements/article2612296.html> (as of Jun. 20, 2016).

13.      Gascon, Viewpoints: Prop. 47 would reduce crime and save money | The Sacramento Bee (Oct. 3, 2014) <http://www.sacbee.com/opinion/op-ed/article2617783.html> (as of Jun. 20, 2016).

14.      Scully, et al., Viewpoints: Prop. 47 would turn criminals loose | The Sacramento Bee (Oct. 3, 2014) <http://www.sacbee.com/opinion/op-ed/article2617791.html> (as of Jun. 20, 2016).

15.      Ravitch, et al., Prop. 47 won't help fight crime | The Press Democrat (Oct. 5, 2014) <http://www.pressdemocrat.com/opinion/2924134-181/prop-47-wont-help-fight?ref=related> (as of Jun. 20, 2016).

16.      Yes on Proposition 47—LA Times (Oct. 6, 2014) <http://www.latimes.com/opinion/endorsements/la-ed-end-proposition-47-20141007-story.html> (as of Jun. 20, 2016).

17.      CALIFORNIANS AGAINST PROP. 47 | No on Proposition 47 (archived Oct. 8, 2014) <http://web.archive.org/web/20141008185016/http://californiansagainst47.com/> (as of Jun. 20, 2016).

18.     Skelton, Prop. 47's sentencing reform should go to Legislature, not the ballot - LA Times (Oct. 8, 2014) <http://www.latimes.com/local/politics/la-me-cap-prop47-20141009-column.html> (as of Apr. 25, 2016).

19.     Editorial: Yes on Prop. 47, sentencing reform - The Orange County Register (Oct. 9, 2014) <http://www.ocregister.com/articles/prop-637855-crimes-measure.html> (as of Jun. 20, 2016).

20.     Lauren Galik: Scale back penalties for nonviolent offenses - The Orange County Register (Oct. 9, 2014) <http://www.ocregister.com/articles/nonviolent-637864-california-crimes.html> (as of Jun. 20, 2016).

21.     Prop. 47 would cut penalties for 1 in 5 criminals in California - LA Times (Oct. 11, 2014) <http://www.latimes.com/local/politics/la-me-ff-pol-proposition47-20141012-story.html> (as of Jun. 20, 2016).

22.     Some California criminals would face lighter sentences under Proposition 47 | The Sacramento Bee (Oct. 12, 2014) <http://www.sacbee.com/news/politics-government/election/article2693849.html> (as of Jun. 20, 2016).

23.     Prop. 47: Good intentions, terrible public policy | SanDiegoUnionTribune.com (Oct. 15, 2014) <http://www.sandiegouniontribune.com/news/2014/oct/15/prop-47-felony-prisoner-release-crimes/> (as of Jun. 20, 2016).

24.     Davis, Prop. 47's central issue: Is punishment needed for minor drug crimes? | SanDiegoUnionTribune.com (Oct. 18, 2014) <http://www.sandiegouniontribune.com/news/2014/oct/18/election-proposition-47-drug-possession-punishment/?#article-copy> (as of Jun. 20, 2016).

25.     Sandra Hutchens: Prop. 47 won't reduce crime, increase safety - The Orange County Register (Oct. 20, 2014) <http://www.ocregister.com/articles/prop-638911-drug-gun.html> (as of Jun. 20, 2016).

26.     Corey Sianez: Prop. 47 won't make O.C. safer - The Orange County Register (Oct. 22, 2014) <http://www.ocregister.com/articles/county-639263-orange-prop.html> (as of Jun. 20, 2016).

27.     Greg Munks and Steve Wagstaffe: Prop 47 will result in increased crime, less safety in neighborhoods - San Jose Mercury News (Oct. 23, 2014) <http://www.mercurynews.com/news/ci_26780581/greg-munks-and-steve-wagstaffe:-prop-47-will-result-in-increased-crime-less-safety-in--neighborhoods> (as of Jun. 20, 2016).

28.  Our Readers Say: Police, sheriffs say no to Prop 47 (Oct. 24, 2014)
<http://www.redlandsdailyfacts.com/opinion/20141024/our-readers-say-police-sheriffs-say-no-to-prop-47> (as of Jun. 20, 2016).

29.  San Bernardino County Police Chiefs and Sheriff's Association says:  No on Prop 47 – Highland Community News: Opinion (Oct. 24, 2014)
<http://www.highlandnews.net/opinion/san-bernardino-county-police-chiefs-and-sheriff-s-association-says/article_1d3fb9f8-5bc3-11e4-8c0f-47ac194ced49.html> (as of Jun. 20, 2016).

30.  County police chiefs, sheriff's say no on 47 - Opinion - VVdailypress.com - Victorville, CA (Oct. 27, 2014)
<http://www.vvdailypress.com/article/20141027/OPINION/141029812> (as of Jun. 20, 2016).

31.  Steinberg, et al., Prop. 47 can help fix prison mental health crisis | The Sacramento Bee (Oct. 27, 2014) <http://www.sacbee.com/opinion/op-ed/soapbox/article3406705.html> (as of Jun. 20, 2016).

32.  Couzens, Prop. 47: a perspective from the bench (Oct. 28, 2014)
<http://www.davisenterprise.com/forum/opinion-columns/prop-47-a-perspective-from-the-bench/> (as of Jun. 20, 2016); see Print,
<http://www.davisenterprise.com/print/?edition=2014-10-28&ptitle=A6> (as of Jun. 20, 2016) [facsimile of print edition].

33.  D. Greenwald, Analysis:  Perspectives on Proposition 47 (Oct. 29, 2014) Davis People's Vanguard <http://www.davisvanguard.org/2014/10/analysis-perspectives-on-proposition-47/> (as of Jun. 20, 2016).

34.  Greene, What does California's Proposition 47 have to do with date rape? - LA Times (Oct. 29, 2014) <http://www.latimes.com/opinion/opinion-la/la-ol-prop-47-roofies-date-rape-20141028-story.html> (as of Jun. 20, 2014).

35.  Rabbi Melanie Aron, Beth Gonzales and Raj Jayadev: Prop 47 is an investment in people, not prisons - San Jose Mercury News (Oct. 29, 2014)
<http://www.mercurynews.com/opinion/ci_26822918/rabbi-melanie-aron-beth-gonzales-and-raj-jayadev?source=pkg> (as of Jun. 20, 2016).

36.  Prop 47 biggest hiccup for city council in choosing ballot positions - San Jose Mercury News  (Oct. 29, 2014)
<http://www.mercurynews.com/news/ci_26825697/prop-47-biggest-hiccup-city-council-choosing-ballot?source=pkg> (as of Jun. 20, 2016).

37.     Rand Paul and B. Wayne Hughes Jr.: Republicans should back Prop. 47 - The Orange County Register (Oct. 29, 2014) <http://www.ocregister.com/articles/crime-640063-california-prison.html> (as of Jun. 20, 2016).

38.     Gerald R. Barnes: Prop. 47 finds right balance - The Orange County Register (Nov. 1, 2014) <http://www.ocregister.com/articles/california-640497-people-prop.html> (as of Jun. 20, 2016).

39.     Christopher Boyd and Mike Durant: Law enforcement united: No on 47 - The Orange County Register (Nov. 1, 2014) <http://www.ocregister.com/articles/prop-640496-association-california.html> (as of Jun. 20, 2016).

_____
RUSHING, P.J.

I CONCUR:

_____
MÁRQUEZ, J.

*People v. Cordova*
**H041050**

69

**H041050 People v. Cordova (Dissent)**

I respectfully dissent from the majority opinion's holding that Proposition 47's definition of "an unreasonable risk of danger to public safety" applies to petitions for resentencing under Proposition 36. (See *People v. Florez*, previously published at 245 Cal.App.4th 1176, review granted and opinion superseded June 8, 2016, S234168). None of the ballot materials accompanying Proposition 47 mentioned Proposition 36, and there is no indication that the electorate intended to modify Proposition 36's definition of an "unreasonable risk of danger to public safety." I would hold that Proposition 47's definition of "an unreasonable risk of danger to public safety" is inapplicable to Proposition 36, and Proposition 47 contains a drafting error that must be judicially corrected.[1]

Additionally, the majority concludes that defendant's argument that the rules of evidence applies to hearings under Penal Code section 1170.126 (unspecified statutory references are to the Penal Code) is not ripe for review, because defendant failed to object to the introduction of certain evidence below. Here, defendant maintains that the court erred in admitting hearsay evidence, including his prison disciplinary records and police reports implicating him in the 1981 and 1983 murders and the 1983 arson. I would find that defendant's argument pertaining to the introduction of hearsay evidence in section 1170.126 hearings is meritless.

Defendant's argument is significantly undermined by section 1170.126, subdivision (g)(2), which expressly authorizes courts to consider petitioners' "disciplinary record[s]." A section 1170.126 petition is a postjudgment vehicle by which certain legally convicted and sentenced inmates may benefit from the later enacted Three Strikes Reform Act.

---

[1] Based on this conclusion, I express no opinion regarding the majority opinion's conclusion regarding the retroactivity of the definition. As the majority notes, this issue is presently being reviewed by the California Supreme Court.

Thus, in my view, a section 1170.126, subdivision (f) hearing is more akin to other posttrial proceedings—such as parole revocation hearings or sentencing—than it is to trial, where the full protections of the Evidence Code apply. Hearsay evidence is admissible at parole revocation hearings, so long as it " ' "bears a substantial degree of trustworthiness," ' " as determined by the trial court. (*In re Miller* (2006) 145 Cal.App.4th 1228, 1235.) It is likewise admissible at sentencing proceedings, so long as there is "a substantial basis for believing [it] is reliable." (*People v. Lamb* (1999) 76 Cal.App.4th 664, 683 ["Due process does not require that a criminal defendant be afforded the same evidentiary protections at sentencing proceedings as exist at trial."]; *People v. Arbuckle* (1978) 22 Cal.3d 749, 754 [a sentencing court may consider a broad range of information, including responsible unsworn or out-of-court statements concerning the convicted person's life and characteristics].) Therefore, hearsay is admissible at section 1170.126, subdivision (f) hearings so long as there is a substantial basis for believing the evidence is reliable.

I do, however, agree with the majority opinion's conclusion that defendant's equal protection argument has no merit, the dangerousness finding need not be submitted to a jury and found beyond a reasonable doubt, and there is no presumption in favor of resentencing.

Lastly, based on my conclusion that the Proposition 47's definition of "an unreasonable risk of danger to public safety" does not apply to petitions for resentencing under Proposition 36, I would find the trial court did not abuse its discretion when it concluded that defendant would pose an unreasonable risk of danger if resentenced. "Where, as here, a discretionary power is statutorily vested in the trial court," the abuse of discretion standard applies on appeal. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)

2

Substantial evidence supports the trial court's finding that, on previous grants of probation and parole, defendant has largely shown himself unable to refrain from reoffending for any appreciable length of time. Substantial evidence also supports the trial court's conclusion that many of defendant's convictions involved weapons, which plainly can expose the public to danger. Specifically, the record shows defendant was convicted of attempted armed robbery, armed residential robbery, possession of a firearm by a felon (twice), possession of a deadly or dangerous weapon, and possession of a concealed dirk or dagger. The trial court also found that "defendant has numerous criminal convictions that are associated with being under the influence of drugs," which led it to conclude that "addiction and . . . controlled substance abuse has played . . . an incredibly significant role in [defendant's] prior criminal behavior." In support of its finding regarding defendant's drug-related criminal convictions, the court erroneously mentioned "the 1983 arson in jail," for which there was no conviction. But, despite that misstatement, substantial evidence nevertheless supports the court's finding that defendant was convicted of drug-related crimes on numerous occasions. The record shows defendant was convicted of driving under the influence three times, possession of a controlled substance four times, and being under the influence of a controlled substance twice. The court's conclusion that "addiction and . . . controlled substance abuse has played . . . an incredibly significant role in [defendant's] prior criminal behavior" is supported by those convictions, as well as by evidence that defendant admitted to being under the influence of drugs and alcohol during the 1973 armed residential robbery.

With respect to defendant's record of rehabilitation while incarcerated, substantial evidence supports the trial court's finding that defendant did not participate in any self-help programming for a number of years in the late-2000s. (§ 1170.126, subd. (g)(2).) The record further supports the trial court's finding that, during that same period, defendant did not address his drug addiction. While defendant told Dr. Barron

3

that he abstained from drug use during those years, as a longtime drug user, there can be no doubt he would have benefitted from continued programming to address his addiction. The court also properly considered defendant's disciplinary record. (*Ibid.*) The court correctly noted that defendant had been disciplined numerous times for drug-related infractions in the months leading up to the filing of his petition. Based on the 2004 incident in which defendant was placed in administrative segregation after prison staff was told defendant threatened another inmate with a shank and defendant's 2006 fight with three other inmates, the court concluded that defendant demonstrated "potential aggressive behavior" on two occasions. I agree that the reports of those incidents support the conclusion that defendant was *potentially* aggressive on both occasions.

The court further found, based on the same two events, that defendant has had "continued proximity [to] and [an] apparent need to surround himself with weapons." I agree with defendant that substantial evidence does not support that finding. In 2004, no shank was found and no disciplinary report was filed. There merely was a confidential tip, which does not constitute reasonable, credible, and solid evidence that defendant was armed in prison in 2004. (*Meyers v. Board of Administration etc. Fund* (2014) 224 Cal.App.4th 250, 260 [substantial evidence is evidence of " ' " 'ponderable legal significance' " ' " that is " ' " 'reasonable in nature, credible, and of solid value' " ' "].) In 2006, guards found a razor blade six feet away from where defendant and three other inmates had a physical fight. The court suggests that defendant was the one who was armed because one of the inmates said a razor blade was pulled on him and the other two said they did not know how the fight started. In fact, defendant told guards, "I don't know what happened." A second inmate said "I don't even know"; a third said he "just got in a fight"; and a fourth reported that a "dude pulled a blade on me." Those statements do not constitute substantial evidence that the razor blade belonged to defendant.

4

Finally, the court considered other relevant evidence as permitted by section 1170.126, subdivision (g)(3). First, the court found defendant was "implicated" in murders in 1981 and 1983. Above, I concluded the court was permitted to rely on evidence of the murders, even if it constituted hearsay, so long as it was reliable. The evidence of defendant's involvement in the murders included the declaration of an investigator with the Santa Clara District Attorney's office, who also was a retired police officer. Because the declaration was made by a law enforcement professional under penalty of perjury, I find that it contained sufficient indicia of reliability to satisfy due process. That declaration alone provides substantial evidence to support the court's conclusion that defendant was implicated in two murders. Accordingly, I conclude the court did not err in relying on evidence of the murders or in reaching that conclusion. Second, the court relied on defendant's mental health and disciplinary records to find that defendant has not overcome his drug addiction. That finding is supported by substantial evidence. Defendant's prison health records show that he used morphine between 2011 and January 23, 2014. Despite expressing a desire to stop using the drug in 2012 and 2013, he achieved only brief periods of sobriety. Defendant underwent treatment for morphine detox between January 24 and January 30, 2014. Because his health records after February 18, 2014, are not in the record, there is no evidence that he has remained sober since that time.[2]

In sum, the court's factual findings are largely supported by substantial evidence. The court did incorrectly refer to the 1983 arson as a conviction in finding that defendant

_____

[2] Defendant told Dr. Barron in April 2014 that he was still not using drugs. However, as the trial court noted, defendant made untrue statements to Dr. Barron. For example, he told Dr. Barron that one DUI was the only crime he committed while under the influence of drugs. But the record indicates defendant committed numerous crimes while under the influence of drugs, including the 1973 armed residential robbery, three DUIs, and two instances of being under the influence of a controlled substance. Therefore, defendant's claim of being drug-free for four months is not credible.

had been convicted of numerous drug-related crimes.  However, because the ultimate finding is supported by substantial evidence, the court's mistaken belief about the 1983 arson was not "critical to its decision" and thus does not establish an abuse of discretion. (*People v. Cluff* (2001) 87 Cal.App.4th 991, 998.)

The court also found that defendant was twice armed in prison, which is not supported by substantial evidence.  That finding, however, likewise was not critical to the court's decision.  I acknowledge that the court referred to defendant's frequent possession of weapons, including "firearms" and "cutting instruments," as its "greatest concern perhaps . . . ."  But even disregarding the prison incidents, the record shows that defendant was frequently (and illegally) in possession of weapons when he was not in custody between 1973 and 1995.

Based on the foregoing, I cannot find that the court abused its discretion in concluding the defendant would pose an unreasonable risk of danger to the public if resentenced.  Defendant has a record of nearly continuous criminal behavior when outside of prison.  Much of his criminal history involves weapons and drug use, both of which pose a risk of danger to the public, especially when combined.  There also is evidence that, contrary to defendant's contention on appeal, defendant has a history of physically harming his victims—namely, the victims of the 1981 and 1983 murders. Defendant's record in prison shows his drug addiction, for which he sought no help during the majority of his lengthy time in prison, remains a problem.  His disciplinary record shows he remains unable to follow the rules or avoid violent confrontations.

Accordingly, I would affirm the order denying defendant's petition for resentencing.

_____

Premo, J.

Trial Court:                                      Santa Clara County
                                                  Superior Court No.:  185632


Trial Judge:                                      The Honorable Linda R. Clark


Attorney for Defendant and Appellant             Keith Allen Wattley
Johnny Melendez Cordova:                          under appointment by the Court
                                                  of Appeal for Appellant


Attorneys for Plaintiff and Respondent           Kamala D. Harris
The People:                                       Attorney General

                                                  Gerald A. Engler,
                                                  Chief Assistant Attorney General

                                                  Jeffrey M. Laurence,
                                                  Acting Senior Assitant Attorney General

                                                  Catherine A. Rivlin,
                                                  Supervising Deputy Attorney General

                                                  Karen Z. Bovarnick,
                                                  Deputy Attorney General


*People v. Cordova*
**H041050**


7